[Crim. No. 615.   Third Appellate District.—October 23, 1922.]

## THE PEOPLE, Respondent, v. RALPH J. ANDERSON et al., Appellants.

[1] CRIMINAL LAW—ROBBERY—CONSPIRACY—CIRCUMSTANTIAL EVIDENCE. A conspiracy to commit a crime may be proved by circumstantial as well as direct evidence; and on this appeal from a judgment of conviction of the crime of robbery, the appellate court could not say upon the evidence, as a matter of law, that the jury were not authorized to find, as the verdict implied that they did find, that

the circumstances disclosed by the evidence were such as to show that the defendants and another, and perhaps a "third man," had conspired together to commit the crime against the person or property of the prosecuting witness.

[2] ID.—ROBBERY—EXTORTION—EVIDENCE.—The salient distinction between the crime of "robbery," as defined by section 211 of the Penal Code, and that of "extortion," as defined by section 518 of that code, is that in the former the property taken is against the will of the owner or possessor, while in the latter the property is taken with the consent of the owner or possessor of the property. In this prosecution the defendants were properly found guilty of the crime of robbery.

[3] ID.—VARIANCE—APPEAL—REVERSAL.—It is only where the evidence compels the conclusion that a crime other than that of which the defendant has been convicted was committed that a reviewing court will be forced to order a reversal of the cause on the ground of variance between the allegations of the accusatory pleading and the proof.

[4] ID.—GUILT OF WIFE—EVIDENCE—VERDICT.—The jury having been justified in finding from the evidence that the defendant wife was a party to the conspiracy to rob the prosecuting witness or in some manner deprive him of his personal property, it was justified in finding her guilty of complicity in the commission of the crime, notwithstanding she was not present when the property was taken and she took no direct part in the act of taking it.

[5] ID.—RETURN OF PROPERTY—MITIGATION OF CRIME—EVIDENCE.—The fact that the defendants returned the property to the prosecuting witness did not of itself relieve their act in taking it of the stigma of the criminality; but it was for the jury to consider that circumstance with the other circumstances in the case in determining the question of guilt or innocence.

[6] ID.—CONSPIRACY—RES GESTAE—EVIDENCE.—In this prosecution for robbery, the trial court did not commit error in permitting the prosecuting witness to testify to the circumstances under which he signed a check and an assignment of the bill of sale and the registration certificate of his automobile and to state that he was compelled by the defendant husband to execute the instruments mentioned, such testimony having related to acts which were evidently a part of the general scheme which constituted the object

---

4. Criminal responsibility of a wife for conspiracy with her husband, note, 4 A. L. R. 282.

6. What force is sufficient to constitute robbery, notes, 135 Am. St. Rep. 474, 493; 57 L. R. A. 432; 46 L. R. A. (N. S.) 1150; L. R. A. 1918E, 937.

of the conspiracy and which were committed before said object was fully accomplished.

[7] ID.—CONVERSATION WITH DEFENDANT — MOTION TO STRIKE OUT — —WAIVER OF OBJECTION.—In this prosecution of a husband and wife on a charge of robbery, the trial court did not commit error in refusing to strike out certain of the testimony of a police officer, who testified as to a conversation had with the defendant husband after his arrest, where counsel for defendants did not at the time of his motion state the grounds therefor or point out the particular part of the testimony which he desired stricken from the record, and he did not ask for an instruction limiting the consideration of such testimony to the defendant husband, as to whom it was competent, relevant, and material.

[8] ID.—SEPARATE TRIALS—DESCRIPTION OF TRIAL COURT—APPEAL.— Under section 1098 of the Penal Code, as amended in 1921, the trial court may, in its discretion, order separate trials of two or more defendants jointly charged with a felony, but it is not bound or required to do so upon the mere request of any defendant; and the action of the trial court in denying separate trials may not be reviewed on appeal in the absence of a record showing that there were circumstances which rendered it peculiarly proper or only just that the several defendants should have been accorded separate trials and that such circumstances were in an appropriate legal way brought to the attention of the trial court.

[9] ID. — ROBBERY — CONSPIRACY — ERRONEOUS INSTRUCTION — DEFECT CURED.—In a prosecution for robbery, committed pursuant to a conspiracy previously entered into by the defendants and a third person, while it is error to instruct the jury that "where a person stands by, aids, assists, or encourages in the perpetration of a crime, he is just as guilty as the person who actually does it, and is to be punished as the principal," the error being that the verbs expressing action are stated in the disjunctive, that defect is cured where the first and the latter parts of the same instruction, with which the objectionable part is immediately connected, correctly state the rule.

APPEAL from a judgment of the Superior Court of Sacramento County. Malcolm C. Glenn, Judge. Affirmed.

The facts are stated in the opinion of the court.

J. S. Daly and Mark L. Burns for Appellants.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendants, who are husband and wife, were convicted of the crime of robbery upon an information, filed in the superior court of Sacramento County, jointly charging them with said crime. A motion for a new trial made in behalf of each of the defendants was denied, and the appeal here is by the defendants from the judgment of conviction and the order refusing to grant them a new trial.

The points upon which the defendants claim that they are entitled to a reversal of the judgment and the order appealed from, generally stating them, are: 1. That there is a fatal variance between the charge set out in the information and the evidence, in this, that the crime charged is that of robbery, whereas, the proof, if it shows that any crime at all was committed by the defendants, discloses that it was the crime of extortion and not that of robbery; 2. That error was committed in the admission of certain testimony; 3. That erroneous instructions upon the law were read to the jury by the court to the prejudice of the rights of the accused.

The theory upon which the information was undoubtedly framed and upon which, it appears clear from the record, the case was tried, was that the defendants and another party, whose name and identity the officers of the law seemed not to have been able to discover, formed and entered into a conspiracy the object of which was to commit the crime charged in the information.

The party upon whom the crime charged is alleged to have been committed is one E. Litts, a painter by trade, and a resident of the city of Sacramento for about five years prior to the time at which the crime is alleged to have been perpetrated. His story of the several circumstances leading to the perpetration of the alleged offense as given at the trial is substantially as follows:

That he first met the defendant, Ethel Anderson, early in the month of November, 1921—either the 3d or 4th of that month—between the hours of 5 and 6 o'clock P. M., at a garage at Seventh and M Streets, in the city of Sacramento, having been introduced to her by one William Jones, the night man in charge of said garage. It appears that Mrs. Anderson had been employed at 621 M Street in said city, but had been given notice on the day upon which she first met Litts that her services at said place were no longer

desired and was requested to remove therefrom.  Just prior
to the time at which she met Litts, as stated, she had been
engaged in conversation with said Jones and had stated to
him that she desired to have a trunk and some other per-
sonal articles which were at the premises at 621 M Street
removed therefrom to the home of her husband's brother
at Thirtieth and G Streets, in the city of Sacramento, and
Jones, after introducing her to Litts, asked the latter if he
would convey the said trunk and articles in his automobile
to said place at Thirtieth and G Streets.  Litts replied that
he would do so; but Mrs. Anderson said that before taking
the trunk, etc., to her brother-in-law's home she would like
to go about the city and see if she could find an apartment
or living-rooms.  Litts stated that he would be pleased to
take her around the city in his automobile for that purpose.
Litts and the said defendant then started out and drove to
several places on as many different streets, stopping at each
long enough to enable Mrs. Anderson to ascertain whether
she could secure accommodations and, having failed to find
suitable rooms for her purposes, Litts drove her back to
621 M Street, where he met the woman's husband, having
been introduced to him by the former.  The trunk and some
other . articles were removed from the house and into the
machine and Litts and Mrs. Anderson took the same to the
home of her brother-in-law and left them there.  While at
this place, Mrs. Anderson telephoned to her husband, saying
that she would meet him at Fifth and K Streets and Litts
drove her to said corner, where she met her husband.  The
couple finally decided to apply to the Central Hotel, between
Fifth and Sixth Streets, on K Street, for lodgings and
Ralph Anderson walked to the hotel and Litts and Mrs.
Anderson went there in the automobile.  In the forenoon of
the following day, Litts again met Mrs. Anderson at the
garage above referred to and again took her in his machine
about the city of Sacramento to look for an apartment or a
place in which to take up her residence.  Finally, they
found and located themselves in rooms at 1316 Seventh
Street, Litts having taken the couple there in his automobile.
Litts, at the request of the parties, went to Thirtieth and G
Streets, got the trunk and other baggage belonging to the
defendants and took them to their Seventh Street apartment.
Litts then returned to the garage at Seventh and M Streets,

where he left his car. He met Mrs. Anderson on the following morning, which was either Friday or Saturday, and she remarked to him that if she were in San Francisco she thought she could secure a position in an apartment house in said city. Litts said to her that he was going down on Sunday morning and if she desired to accompany him she could do so. She readily agreed to this and on Sunday they together drove to San Francisco in Litts' automobile. After Mrs. Anderson had telephoned to certain parties in San Francisco, she reported to Litts that she was not able to secure employment and later in the day they started on their return to Sacramento, arriving there and at her home at 1316 Seventh Street at about ten minutes after 10 o'clock that night. Litts thereupon drove his machine to the garage and then went to his room at 815 F Street and retired for the night. Litts testified that Mrs. Anderson told him that her husband knew that she was going to San Francisco—that, in fact, he had advised her to accompany Litts to the city for the purpose for which she desired to go there, as above indicated. On the following evening, shortly after 5 o'clock, Litts met Mrs. Anderson at the garage. She stated that she expected that he would be at the garage at that hour, for she was aware of his custom of taking his automobile out every evening near that time. She at that time told him that her husband had deserted her; that he was very angry because she returned home so early from San Francisco the preceding evening, saying that she should not have left the city until she could have seen the lights of the metropolis from the ferry-boat, and that they quarreled and "fought all night and he took what money they had and left her with but nineteen cents." Litts thereupon asked her what she proposed to do and she replied, "It is up to you," to which he retorted, "I can't do anything; he will be back," and asked her if he had taken his clothes, to which she answered that he had not taken all of them and Litts repeated: "He will be back; just go on back home again and he will be back over there." She said that he would not return, for he had been waiting for a chance to get away for a long time. She said that she expected to go to work at the Central Hotel for her room and Litts then told her that "if she could find a room, I would give her enough to eat on until she got a job and that is all I could

do.'' She replied that she could not go to work, as she had no clothes, and then proposed that if Litts would secure a place she would keep house for him. Litts replied that he did not know whether he could or could not do that, and after she had stated that she would have to do something and that she was not able to work, Litts added, ''You can look around and see; that's all you can do and perhaps you can find a job.'' He then left her at the garage and went to his home. It appears that Mrs. Anderson was dissatisfied with her rooms at 1316 Seventh Street and after the conversation last referred to with Litts she started out to look for another place and finally came to 1229 E Street. She subsequently met Litts and reported to him that she had found rooms which would be suitable if he desired to rent them, and on the day following that of the conversation last mentioned he, accompanied by Mrs. Anderson, drove to 1229 E Street and Litts rented the same, paying, with his own personal check, fifty-five dollars as the first month's rental. After securing said place Litts, at the request of Mrs. Anderson, drove to Sixth and M Streets, where she got out, and he left his machine in front of the ''Old Pavilion,'' at Sixth and M Streets. This was about 3 o'clock in the afternoon. He walked over to K Street, remained for about ten or fifteen minutes, and then returned to where he had left his automobile, and found Mrs. Anderson sitting in the machine. She had in her hand ''the little tin plate that holds the license tag, or registration certificate of the automobile,'' and he asked her where she got it, and she said, ''It was in the book.'' He replied that it was strange that it was in there, as he always kept it ''in the top of the car,'' and he thereupon ''put it back in the book and slipped it down between the two front seats,'' there being two separate and distinct seats in the front part of the car. They then went to 1316 Seventh Street, secured the trunk and baggage belonging to Mrs. Anderson, and took the same to the rooms at 1229 E Street. They lived together at the latter place for some six or seven days, occupying the same room and the same bed. On one occasion, while they were thus living together, Mrs. Anderson asked Litts why he did not leave his car in front of the house instead of taking it to a garage, and insisted upon him doing so. He said that he would not do that, as he had a place to keep the car and he

intended to leave it there at nights. On the morning of the 15th of November, 1921, about 2 o'clock, Litts was awakened by someone moving about in the room. A light was turned on and he observed that it was Mrs. Anderson, who had arisen from the bed. She remarked that she was unable to sleep. He asked her what time it was and she said ten minutes after 2. She returned to the bed. Litts immediately went to sleep but in a short time thereafter he was awakened by the glare of a spotlight which was flashed in his face. He soon recognized, by the aid of the light reflected from the spotlight, the defendant, Ralph Anderson, husband of the woman who was sharing the bed with him at that time. A light was then turned on and Anderson asked: "Who is that woman in that bed?" to which Litts replied, "A wife." Anderson then in a loud voice exclaimed, "That's my wife." Litts said, "I don't know whether it is or not." Anderson replied, "I have got a secret man out here in the car. I am going to take you·down and take you to police headquarters." Litts answered, "All right, I will go with you," but when he started to get up, Anderson, with his gun, pushed him back in bed. Accompanying Anderson to the room of Litts were two other men, one of whom, because of the active part he took in the occurrences in Litts' room, is referred to throughout the record of this case as "the unknown man." Both Anderson and the "unknown," as we will hereafter refer to the man who was especially active in the carrying out of the transactions occurring in Litts' room, had revolvers in their hands and the unknown also had a spotlight. Anderson demanded of Litts a writing to be subscribed by the latter, admitting that he had been cohabiting with the former's wife. At first Litts refused to sign any such document, saying he did not know whether the woman was really Anderson's wife or not. While this conversation was proceeding between Anderson and Litts, the unknown was ransacking Litts' suitcase and also his coat, vest, and trousers, and in the suitcase he found the certificate of registration of Litts' car, a bill of sale to Litts from the party from whom he had purchased the car, a lady's gold watch with a diamond setting, some old coins which Litts had preserved, a Liberty Bond for fifty dollars, and an electric flatiron, all of which he took possession of. He also found in the vest or coat pocket of Litts the latter's

checkbook, which he threw on the bed, and a bill-book containing fifteen dollars in currency. He handed the bill of sale and the certificate of registration to Anderson and the latter made a demand on Litts to assign to him the bill of sale and the said certificate. Anderson also at this time demanded from Litts a check on his bank for the sum of ninety-five dollars. He first asked Litts how much money he had in the bank and the latter replied that he did not have very much money on deposit. "Well," continued Anderson, "there is eleven hundred dollars in there." Litts asked, "How do you know?" The defendant answered, "I know; I got the dope on all that; the last check you drew was fifty-five dollars." (It may here be stated that Litts testified the last check he drew on his bank account was for the sum of fifty-five dollars, with which he paid the rent for the apartment he and Mrs. Anderson were occupying and that the drawing of that sum from the bank reduced his bank account to the sum eleven hundred dollars.) Litts refused to sign the document and to make out the check demanded, but the demands, according to the testimony of Litts, were made in such a violent and threatening manner that he finally agreed to sign the statement involving an admission that he had cohabited with Mrs. Anderson for several days. He also agreed to make the assignment of the bill of sale and certificate of registration. Anderson called for some ink so as to prepare the several documents mentioned, but Litts said that he had no ink in the house, whereupon Anderson, according to Litts' testimony, ordered the unknown and the "third man" (as we will hereinafter refer to the man who was with Anderson and the unknown) to go to the garage at seventh and M Streets, procure some ink and a pen and return as soon as possible. The unknown and the third man thereupon left the room, but within a few minutes the unknown returned to the room and remained with Anderson. In the course of twenty or thirty minutes the third man returned with some ink in a salt cellar and a pen point. Litts, upon again being demanded by Anderson to do so, signed the several documents, the unknown signing the name of Harrison Stewart as a witness to the execution of the assignment of the bill of sale. Litts also signed a check for the sum of ninety-five dollars, omitting, however, to insert therein the name of the payee. Anderson objected

to the signature to the check, saying that it did not correspond in style or form with Litts' signature as written in the certificate of registration of his car and also objected to the omission to insert his (Anderson's) name in the check as the payee thereof. Anderson thereupon filled out a new check for the sum of ninety-five dollars, payable to him, and demanded of Litts that he sign the same, which was done. While all this was going on the unknown was arranging the several articles of personal property above mentioned in such manner as to make it convenient for him to carry them away and also stepped up to Litts and took from his fingers two diamond rings, this latter act being done while the defendant, Ralph Anderson, was still standing near the bed and in conversation with Litts. After all this occurred, Ralph J. Anderson and the unknown left the house, but within a few minutes returned and procured the trunk and other articles belonging to Mrs. Anderson and removed them from the house. They took with them the bill of sale with the assignment thereof to R. J. Anderson indorsed upon it by Litts, the certificate of registration of Litts' car, also indorsed with an assignment thereof to said Anderson, the check for ninety-five dollars, the Liberty Bond for fifty dollars, the bill-book containing fifteen dollars in currency, a statement subscribed by Litts confessing that he had been cohabiting with Mrs. Ethel Anderson for several days, the lady's gold watch, the diamond rings, some old coins, an electric flatiron, and some clothing belonging to Litts. After Anderson and the unknown had left the premises, Litts arose, went to the telephone, called the police station and informed the officer in charge of what had taken place in his room and telling him who the parties were that had committed the acts which have been described. About 6 o'clock in the morning Litts went to the garage on Twelfth Street, between E and F, where he left his car the night before and which, it will be noted, is a block only from his apartment at 1229 E Street, and while standing in front of the door of the garage the defendant, Ralph Anderson, walking, put in an appearance, passed within a few feet of Litts without saluting or, apparently, noticing the latter and soon disappeared from Litts' sight. Late in the evening of that day (the 15th), after a complaint had been sworn to by Litts against the Andersons and the unknown, as John Doe,

charging them with robbery, and a warrant thereupon issued and the publication of the fact of the filing of the charge by the evening newspapers of Sacramento, the defendants, R. J. and Ethel Anderson, accompanied by J. E. Taylor, the proprietor of the garage at Seventh and M Streets, appeared at the rooms of Litts at 1229 E Street and returned to him the two diamond rings, the certificate of registration of the car, the bill of sale, the check for the ninety-five dollars, the electric flatiron, the watch, a fountain-pen, a few of the old coins and the bill-book, minus the currency therein contained at the time these articles were taken from Litts by said parties. The Liberty Bond, the clothing taken and the currency in the bill-book were not returned. The foregoing statement is, as has already been indicated, taken from the testimony of Litts. It should, however, be added that Mrs. Anderson was not a witness to the occurrences in Litts' room above narrated, having immediately left the room upon the appearance therein of her husband and the unknown.

J. E. Taylor, above mentioned, testified that he was not only a part owner of the garage at Seventh and M Streets, but was also engaged in the motor delivery business; that the defendant, Ralph Anderson, who at one time worked at said garage for him (Taylor), came to the garage on the evening of the 14th of November, 1921, about the hour of 7:30, and asked him if he (Taylor) would haul Mrs. Anderson's trunk to the garage and store it there for a few days. Taylor said that he would do as so requested, but testified that at that time Anderson did not inform him where the trunk was. At this time Anderson was engaged as a taxi driver for one of the taxi companies of Sacramento and about midnight of the said fourteenth day of November he again appeared at the garage in a taxi which he was driving and again requested Taylor to haul Mrs. Anderson's trunk to the garage. Taylor asked Anderson where the trunk was and Anderson suggested that when he was ready to go for the trunk that he (Taylor) follow him (Anderson) to the place where the trunk was to be found. Later on, about 2 o'clock A. M. of the 15th, Anderson returned to the garage and stated that he was prepared to go to the place where the trunk was. Taylor, accompanied by one of his employees, by the name of Murphy, followed Anderson to 1229 E Street. Anderson was accompanied in his taxi by the party hereto-

fore referred to as the unknown. Here it should be stated that, as to the unknown, Taylor testified that he did not know the man and that he had never seen him until early on the day previous—the 14th of November—when he (the unknown) was in the company of the defendant, Ralph Anderson. Anderson and the unknown, however, on arriving at 1229 E Street, left the taxi and went to the door of and entered the house. It appears that Taylor was employed to deliver to the postoffice the mail deposited in the postoffice boxes in the outlying districts of the city, and as it was approaching the time when he should make a collection of the mail, he left the house, after waiting in vain a number of minutes for Anderson's return from the house with the trunk, intending, as he stated, to return to said house after he had collected the mail from the boxes and delivered the same at the postoffice. About half an hour later, or near 2:30 o'clock A. M., Taylor, being required to go to Twelfth and C Streets to secure mail from the box stationed at that corner, on returning, stopped at 1229 E Street and sounded his horn several times. He saw the defendant, Mrs. Anderson, sitting in her husband's taxi. Within a few minutes after he had sounded his horn, the defendant, Ralph Anderson, and the unknown came out of the house and stepped to the sidewalk, not bringing the trunk with them. Taylor asked Ralph Anderson about the trunk and thereupon Anderson and the unknown returned to the house and soon reappeared with the trunk and placed it in Taylor's motortruck. Taylor then started for the garage and Ralph Anderson, his wife, and the unknown followed in the taxi. The Andersons and the unknown arrived at the garage a few minutes after Taylor and his employee, Murphy, had reached there. The defendants went into the garage, accompanied by the unknown, and a general conversation ensued between Taylor and the Andersons. Suddenly, so Taylor testified, the unknown "sprang up" and exclaimed, "See what I got from that guy," at the same time exhibiting the rings, watch, and other articles heretofore mentioned. Anderson declared that he did not want the jewelry and articles in the possession of the unknown and then stepped over and held a conversation with his wife, the nature of which was not made to appear at the trial. Taylor said to the unknown: "You had no business taking that stuff out there." The

latter replied: "Well, I got it and I will keep the rings," at the same time, turning and facing Anderson, said that the latter could have the rest of the articles. Finally, the rings, watch, and certain other articles were wrapped up and Taylor said to the defendants that they should return them to Litts. Certain of the articles mentioned were returned to Litts by the Andersons as indicated above.

While the Andersons and Taylor were at Litts' apartment for the purpose of returning to him the rings, watch, etc., Taylor telephoned to the police station and informed the officers in charge that the Andersons were then at 1229 E Street. Officers Becker and McKinney, armed with the warrant of arrest which had been earlier that day issued by the police court upon the complaint of Litts, immediately went to Litts' apartment and there placed the Andersons under arrest. These officers testified that they had a conversation with Ralph Anderson while he was incarcerated in the city prison, and that he stated to them that he had met his wife, Ethel Anderson, on the afternoon of the fourteenth day of November, 1921, and that there was then an understanding had between them that Mrs. Anderson would that night unlock the door leading to Litts' rooms from the street so that he could readily enter said rooms when he went there during said night, as he contemplated doing; and, in this connection, it should be stated that Litts testified that he always kept the door leading to his apartment from the street locked.

The above comprises substantially all the testimony presented by the people in support of the charge set forth in the information, and, while it is in our opinion sufficient to sustain the charge, as we shall later undertake to show, still it will be interesting to note that the testimony of the defendants in their own behalf is rather confirmatory than otherwise of the theory of the prosecution that the taking of the property of Litts under the circumstances as above described was the culmination of a conspiracy previously formed and entered into by the Andersons and the unknown, and we will, therefore, reproduce herein in a general way the testimony of the defendants.

There is little material variance between the testimony of Ethel Anderson and that of the complaining witness, Litts, as to the circumstances under which the two first became

acquainted with each other; nor is there any substantial difference between them with regard to the circumstances leading to the renting of the apartment at 1229 E Street by Litts and the fact that the said defendant entered into the relationship with Litts, as detailed above.

Ethel Anderson admitted that her husband became angry with her on the night of her return with Litts from San Francisco, but declared that the ground of her husband's indignation was in the fact that she had returned home later in the night than he thought that she should and that he did not quarrel with her because she had returned home "too early." She stated that her husband early on the day following that of her return from San Francisco left her with only nineteen cents in her possession. She admitted meeting Litts that day and that she then explained to him her condition financially and also told him that her husband had gone in search of work but that she did not know whether he was looking for employment in the city or had gone to the country for that purpose and said that it was necessary for her to secure employment. She testified that after considerable discussion between herself and Litts, the latter suggested that he would rent rooms and employ her to keep house for him. She agreed to this proposition and Litts advanced her the sum of twenty dollars. She testified that she went to 1229 E Street with Litts and there took up her abode; that the first night that they were there together and when it was time to retire, she proposed to sleep on a davenport bed and suggested that Litts take the bedroom, but Litts, so she testified, said that there was no reason why two rooms should be "mussed up," since both of them could occupy the bed. She strenuously objected to this proposition, so she declared, and thereupon Litts suggested that she take the bed and he would take the davenport; that after she had retired Litts came to the room and, against her vigorous protest, got in bed with her; that Litts violently and by means of force outraged her person. She admitted, however, that notwithstanding this offensive conduct on the part of Litts, she, nevertheless, remained in bed with him that night and occupied the same bed with him every night until the morning of the 15th of November, 1921, when her husband and the unknown appeared upon the scene and carried out the several transactions above described. She

testified that on the day following the night of that sordid experience with Litts she went to Taylor, proprietor of the garage at Seventh and M Streets, and related to him the facts of Litts' mistreatment of her the night before. She admitted that she arose from bed near the hour of 2 o'clock on the morning of the 15th and corroborated the testimony of Litts to the effect that he asked her the reason she had arisen from the bed and that she replied to him that she could not sleep and also in reply to Litts told him that it was then about ten minutes after 2 o'clock. She further testified to the circumstance of the entrance into the house of her husband and the unknown; that her husband had a spot-light which he thrust into the face of Litts and upon a light being turned on discovered her in bed with Litts; that he said to her in a loud and vehement manner, "Get the hell out of here as quick as God Almighty will let you"; that she hastily arose, dressed and, placing a few articles, belonging to her in her trunk which was in the room, fled from the house; but, seeing a car in front of the house and believing it to be that of her husband, she took a seat in it and remained there until her husband returned and with the unknown drove her to the garage at Seventh and M Streets, as already explained. She testified that on the afternoon of the 14th of November she met her husband near Seventh and J Streets; that she then for the first time learned that he was employed by a taxi company as a driver; that she told her husband that she was working at 1229 E Street, but that her husband did not ask what she was doing, for whom she was working, or what compensation she was receiving. She stated that, at the request of her husband, she went to a rooming-house and secured a room for her husband, he giving her the sum of four dollars to pay for the same; that the rent of the room for a week was the sum of six dollars, and that she returned to Seventh and J Streets, informed her husband that she had secured the room, paid down the four dollars he had given her and that there was still two dollars to be paid; that thereafter she took the street-car and returned to 1229 E Street.

The defendant, Ralph Anderson, testified that he became acquainted with Litts on the 4th of November, 1921, and corroborated in a general way the testimony of his wife as to the latter's efforts to find living-rooms or an apartment,

assisted by Litts. He stated that on the 14th of November he was, and for some days prior thereto had been, employed by the Adams Taxi Company in Sacramento as a taxi driver. He testified that on that day, near the hour of half-past 5 P. M., he had occasion to visit the garage at Seventh and M Streets and there met J. E. Taylor, by whom at one time he had been employed, and that on that occasion Taylor told him that his wife had been at the garage to see him, Taylor, and had reported that Litts was not treating her right and that Taylor advised him to "go down there and get her"; that, upon receiving this information he made no reply, but walked away and went to his room and, as his employment with the Adams Taxi Company required him to enter upon the discharge of his duties near the hour of 1 A. M., he retired. He arose at 12:30 A. M. and shortly thereafter took up his work and made two trips and then went to Taylor's garage for the purpose, so he testified, of requesting Taylor to go to 1229 E Street, get his wife's trunk and remove it to the garage; that while engaged in conversation with Taylor concerning this matter, a stranger —a man whom he had never seen before and whose name he never learned—and who is referred to herein as the unknown, was standing near and stepped up to him and asked him "what was wrong, and I told him and he volunteered to go out with me and help me bring the trunk back." Said defendant accepted the proffered service and the unknown accompanied him to the rooms occupied by his wife and Litts. This was about 2 o'clock A. M. Arriving at 1229 E Street, continued said defendant, he and the unknown stepped from the sidewalk to the door leading into the apartment of Litts, and he rang the door-bell, to which no answer was made and he thereupon "tried the door and it opened and I walked in," the unknown following. Said defendant stated that it was his intention to break the door down and enter the house if Litts or some other inmate thereof did not respond to the bell and open it; that his mind was fully made up, before arriving at the place, to kill Litts if he found any evidence of immoral relations between the latter and the defendant, Ethel Anderson. After getting into the house he "searched around" for the bedroom and found Litts and his wife in bed together. "I believe," continued said defendant, "the first thing I did was to tell

my wife to get up out of the bed and got out of the house."
He admitted demanding of Litts a signed statement to the
effect that he and Ethel Anderson had been living in said
house as "man and wife," but that Litts at first refused to
sign any such statement; that he asked Litts if he had any
ink in the house and the latter replied in the negative and
said "if I wanted ink so badly I will have to get it myself,
and this fellow [referring to the unknown] and I left the
house and went down to Taylor's, got the ink, came back
again and then Litts signed the statement and all these other
papers at the time." In this connection, it should be stated
that said Anderson denied that there was a third party
with them, and as is to be implied from the statement that
he and the unknown went after the ink, denied that any
"third man" went after that article. Asked how Litts
came to sign the assignment of the bill of sale and certifi-
cate of registration of his car, said defendant testified that
"this other fellow [referring to the unknown] brought this
certificate and this bill of sale over to me and demanded
me to have Litts sign them." "Q. And did you demand of
Litts that he sign them? A. Yes." He admitted that he
saw the unknown take from Litts' fingers the two diamond
rings but that he did not know that he (the unknown) had
taken the other jewelry and other articles of personal prop-
erty, nor was there any understanding between him and the
unknown that any property should be taken by them from
Litts. On cross-examination he declared that he was very
angry during all the time he was in Litts' room, but that
the idea of killing Litts "had got out of my mind at that
time." He admitted commanding Litts to issue to him his
personal check for ninety-five dollars, but denied that a check
omitting therein his name had previously been signed by
Litts and destroyed upon his suggestion that he preferred
a check containing his name as the payee. He admitted that
Litts drew the check and signed his name thereto, but he
said that the unknown took the check, the bill of sale, the
certificate of registration, and all the articles of personal
property heretofore enumerated; that all he took with him
was the statement as to Litts' relations with his wife. He
stated that they remained in Litts' room from 2 to 3:30
A. M.; that Taylor took his wife's trunk in his automo-
bile to the garage and that he, his wife, and the unknown

followed in the taxi he was then driving. His testimony as to what occurred after they had arrived at the garage harmonizes in a general way with that of Taylor and the defendant, Ethel Anderson. Asked if he did not, early of the morning of the 15th and after he had left Litts' room, pass the garage on Twelfth, E and F Streets in which Litts had left his car and see Litts standing outside and in front of said garage, he replied that he did go back to Twelfth and E at the hour named, intending to tell Litts where his jewelry and other articles of personal property taken by the unknown could be found; that in going to Litts' rooms at that time he might have passed the garage, but that if he did he did not know it and that he did not see Litts while he was then on the way to the latter's place of residence. He corroborated the testimony of his wife and Taylor to the effect that he, accompanied by the two former, went to Litts' rooms about 7 o'clock the evening of the 15th and returned to Litts certain of the articles, including the rings and the watch, but admitted that at that time he knew that a warrant of arrest had been issued against him upon a complaint charging him with the crime of robbing Litts, having read of the same in the evening newspapers of Sacramento.

We now have presented a fair statement, in substance, of the testimony of the two defendants, and, as before declared, considering the general trend thereof, it seems to sustain, rather than refute—at least we can say that upon its face the jury could well have so concluded—the theory upon which the case was presented by the people, to wit, that the several transactions carried out by the defendants in Litts' room were parts of a conspiracy formed and entered into by the defendants and the unknown (and perhaps the "third man" referred to by Litts as having been in the room with Ralph Anderson and the unknown) to despoil Litts of his personal property and money. At any rate, the testimony of the defendants is, upon its face, in many respects, so utterly unbelievable that the jury, as most probably they did, could have justly repudiated it *in toto*. We will not attempt to point out the palpable inconsistencies thereof or dilate upon the obvious inconsistency which inheres in the story itself told by each. Their stories, in almost all particulars, are so far at variance with a reasonable or sensible explanation of the occurrences leading to and characterizing the

taking of Litts' property that they plainly speak for themselves and so betray their intrinsic improbability.

[1] It will not be questioned that a conspiracy to commit a crime may be proved by circumstantial as well as direct evidence and we cannot say upon the evidence, as a matter of law, that the jury were not authorized to find, as the verdict implies that they did find, that the circumstances disclosed by the evidence were such as to show that the defendants, the unknown, and perhaps the "third man," had conspired together to commit a crime against the person or property of Litts. [2] Nor, upon a reading of the testimony, can there arise any rational doubt that the defendants were properly found guilty of the crime of robbery and that the conspiracy entered into between the defendants and the unknown was to accomplish that object. That crime, as defined by section 211 of the Penal Code, is "the felonious taking of personal property, in the possession of another, from his person or immediate presence, *and against his will,* accompanied by means of force or fear." "Extortion," which the defendants claim the evidence shows was the crime committed, if any crime at all was committed, "is the obtaining of property from another, *with his consent,* induced by a wrongful use of force or fear, or under color of official authority." (Sec. 518, Pen. Code.) Thus, it will be noted, the salient distinction between the two crimes is that in the one the property taken is against the will of the owner or possessor, while in the other the property is taken with the consent of the owner or the possessor of the property. There is not a single line in the evidence from which the inference is justified that the property taken from Litts was with his consent. There is no claim here, nor could there be upon the evidence as it is disclosed by this record, that the property was obtained "under color of official right." The evidence clearly shows that the defendant, R. J. Anderson, and the individual known herein as the unknown, with revolvers in their hands, entered Litts' apartment in the dead of night, while he was asleep, and threateningly demanded of him the assignment of the bill of sale of his car, the transfer of the certificate of registration of said car, and a ninety-five dollar check drawn upon the funds of Litts in the bank, and compelled him to execute these written instruments and at the same time took from him certain of

his personal property. There was nothing in the whole
transaction which could have inspired in Litts such a fear
as would induce him willingly or with his consent to de-
liver over to the said parties his money and personal prop-
erty. Indeed, there was but one statement in all that oc-
curred in the room which of itself could possibly be
regarded as a sufficient foundation for a motive in Litts to
willingly part with his check and the articles which were
taken from him, and that was the statement of R. J. Ander-
son that there was awaiting outside a secret service officer
into whose custody he intended to commit Litts; but the
latter, it will be observed, upon having been told by Ander-
son that such an officer was near at hand for the purpose
of taking him into custody for his immoral relations with
Ethel Anderson, unhesitatingly stated that he was prepared
to accompany the officer and attempted to arise from his
bed for that purpose, when said Anderson, by a shove, threw
him back on the bed. This circumstance clearly shows, or
at least the jury could have so construed it, that Litts was
not possessed of such fear as to the matter of being pro-
ceeded against for maintaining illicit relations with Ethel
Anderson as to have induced him willingly to issue to R. J.
Anderson a check for ninety-five dollars and turn over to
him the other property which was taken. But there stands
the uncontradicted testimony that, while Anderson was en-
gaged in conversation with Litts relative to the latter's
relations with Ethel Anderson, the unknown was busily
engaged in ransacking the suitcase and rifling the trousers,
vest and coat pockets of Litts, from which he took and
kept certain jewelry and other articles of personal property,
and also, before Ralph Anderson's eyes, as the latter ad-
mitted at the trial, violently took from Litts' fingers the two
diamond rings. There is nothing in the evidence from
which the theory that Litts willingly parted with these
articles could possibly be deduced. In short, no one can
read the evidence in this case without coming to the conclu-
sion that Litts not only did not willingly turn over his
money and property to the defendant, R. J. Anderson, and
the unknown, but suffered them without protest to take
said money and property because he was at the time influ-
enced by the fear that any attempt on his part to resist them
or to prevent them from taking said property would be

followed by the infliction upon him by them of bodily injury. But, even if it were necessary to concede that the evidence disclosed some semblance of the crime of extortion, it cannot be doubted that the evidence is such that the finding of the jury that the crime committed was robbery is conclusive upon this court. [3] It is only where the evidence compels the conclusion that a crime other than that of which the defendant has been convicted was committed that a reviewing court will be forced to order a reversal of the cause on the ground of variance between the allegations of the accusatory pleading and the proof. (*People* v. *Lewis,* 141 Cal. 543 [75 Pac. 189] ; *People* v. *Crane,* 34 Cal. App. 599, 606 et seq. [168 Pac. 377].)

[4] It is, however, vigorously contended that there is absolutely no evidence showing or even tending to show that Ethel Anderson was guilty of complicity in the commission of the crime. This contention is founded upon the fact that she was not in the apartment when the transactions occurring therein between her husband and the unknown and Litts took place. But this was a matter for the jury to pass upon. We need not specifically point to the circumstances developed in the case from which the jury could justly conclude, and no doubt did conclude, that Ethel Anderson was a party to the conspiracy to rob Litts or in some manner wrongfully deprive him of his personal property. If she was a party to such a conspiracy, then it matters not that she was not present when the property was taken by her husband and the unknown and took no direct part in the act of taking it. The asseverations of R. J. Anderson at the trial that the unknown alone took the jewelry and other property and that he had no part in such taking were also matters for the jury to determine. And we may well add, as we have in effect before stated, that the jury could not go beyond a reasonable interpretation of the occurrences at the Litts apartment in deciding, as impliedly they did, that said defendants' protestations of innocence, in so far as the taking of the property was concerned, were wholly out of line with the truth of the matter.

[5] Nor does the fact that the defendants returned the property to Litts of itself relieve their act in taking it of the stigma of criminality. It was for the jury to consider that circumstance with the other circumstances in the case

in determining the question of guilt or innocence. It is evident from their verdict that they regarded, as justly from the evidence they were so warranted, the act of returning the property, not as evidence that the defendants did not intend to deprive Litts thereof, but as one the doing of which occurred to the minds of the defendants only after they had received information that a warrant had been issued for their arrest, that if apprehended they would be prosecuted upon the charge of robbery and that the return of the property might operate as a ground upon which they could successfully predicate the claim of innocence of criminal intent.

[6] The contention that error was committed in permitting the witness, Litts, to testify to the circumstances under which he signed the check, the assignment of the bill of sale and the registration certificate of his automobile and to state that he was compelled by the defendant, Ralph J. Anderson, to execute the instruments mentioned, is entirely without merit. The ground of the objection was and is that the testimony related to a crime different from that with which the defendants are charged. But this testimony was admissible under the rule of *res gestae.* (Sec. 1850, Code Civ. Proc.) It related to acts which were evidently a part of the general scheme which constituted the object of the conspiracy and which were committed before said object was fully accomplished.

[7] It is claimed that it was error for the court to refuse to grant the motion of the defendants to strike out certain of the testimony of Police Officer McKinney. That officer, it will be recalled, testified that, in a conversation with the defendant, Ralph J. Anderson, after his arrest, the latter, explaining how he got into Litts' apartment, stated that he (Anderson) had in the afternoon of the 14th of November, 1921, met his wife on the street and that then they had an understanding whereby she was to unlock the door to the said apartment so that her husband could enter it that night or early the following morning. This statement by said Anderson to the officer was not made in the presence of his wife. After the officer had given this testimony, the following occurred: ''Question by the District Attorney: Is that all the conversation? A. And we tried to find out from him who this other party was that was with him that night.

Mr. Daly, Counsel for Defendants: We move to strike this out.'' No ground for the motion was stated, and no ruling was made upon the motion, the district attorney proceeding, as if not interrupted, to ask the officer questions regarding the identity of the ''other party'' who was with the defendant in Litts' apartment. No objection had, previous to the motion to strike out, been made to the testimony of the officer as to the conversation between him and R. J. Anderson. No question was asked as to whether the conversation was or was not had in the presence of Ethel Anderson, the wife of R. J. Anderson. The court should, of course, have ruled upon the motion, notwithstanding the ground therefor was not stated; but if it had ruled and denied the motion and the ruling was erroneous, the error so committed could not be of any avail to the defendants on this appeal for at least two reasons: First, it is not clear to what part of the officer's testimony the motion was addressed, the counsel not having specifically pointed out at the time of his motion the particular part of the testimony which he desired stricken from the record; second, the testimony, it will be conceded, was competent, relevant, and material as to the defendant, R. J. Anderson, and if counsel desired to confine the consideration thereof to said defendant, he should have asked for an instruction so limiting the consideration of the testimony by the jury. He failed to do this and such failure involved a failure to preserve the rights of the defendant, Ethel Anderson, in that particular.

[8] The point next urged in the briefs, although in regular order it should have been the first to be advanced and considered, is that the trial court abused its discretion in its order denying the motion of the defendants for separate trials. Formerly, the law was that where two or more persons were jointly charged with a felony, any defendant so charged requiring it should be tried separately. (See section 1098 of Deering's 1915 edition of the Penal Code.) In the year 1921, however, the legislature amended said section so that it now reads in part as follows: ''When two or more defendants are jointly charged with any public offense, whether a felony or a misdemeanor, they must be tried jointly, unless the court order separate trials. . . . '' (Stats. 1921, p. 90.)

Thus it will be noted that the court may, in its discretion, order separate trials of two or more defendants jointly charged with a felony, but is not bound or required to do so upon the mere request of any defendant. We presume that if there were circumstances in a particular case which would render it peculiarly proper or only just that there should be accorded to several defendants so charged separate trials, and such circumstances were in an appropriate legal way brought to the attention of the trial court, the question whether such court, in denying separate trials, had abused its discretion might be a proper subject of review. In the instant case, though, there is no showing which presents a reviewable question. The mere request of the defendants for separate trials and the order refusing the application constitute all there is of the record upon that question, and, obviously, upon such a showing this court cannot say whether there was or was not an abuse of discretion in the making of the order complained of. The same question has been considered by the courts of other state jurisdictions and by the federal courts, and by those courts held that whether two or more persons charged jointly with a felony shall be tried together or separately is discretionary with the trial court. (See *Commonwealth* v. *Boraskey et al.*, 214 Mass. 313, 316 [101 N. E. 377], and other cases therein cited; *United States* v. *Ball et al.*, 163 U. S. 662 [41 L. Ed. 300, 303, 16 Sup. Ct. Rep. 1192, see, also, Rose's U. S. Notes]; *Lee Dock et al.* v. *United States*, 224 Fed. 431 [140 C. C. A. 125]; *United States* v. *Marchant*, 12 Wheat. (25 U. S.) 480 [6 L. Ed. 700].) Whether there was a statute upon the subject in any of those cases does not appear, but we judge that in Massachusetts there was no such statute from the fact that in *Commonwealth* v. *James*, 99 Mass. 438, the supreme court of that state uses this language: "The general rule is that persons jointly indicted should be tried together."

The objections to the action of the court in the giving and refusing to give certain instructions are numerous, but a few only of the assignments under this head will be given special notice herein.

[9] A portion of the language of the instruction based upon section 31 of the Penal Code, and because of the giving of which the defendants complain, is subject to just criticism, but, considered in its entirety, we cannot say that

the jury could have been misled by it into a misapprehension of the rule declared by said section. The instruction stated, in the language of said section, that "all persons concerned in the commission of a crime, whether it be a felony or a misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, are principals in any crime so committed." Thus far the instruction is unobjectionable. But the instruction proceeds: "In other words, *where a person stands by, aids, assists, or encourages in the perpetration of a crime, he is just as guilty as the person who actually does it, and is to be punished as the principal.* So that, if you believe beyond a reasonable doubt, from all the facts and circumstances and evidence in this case, that the defendants, or either of them, aided, abetted and encouraged the robbery . . . , if you find such robbery was committed, then it is your duty to find said defendant or the one so aiding and abetting, guilty as charged in the information." It will be noted that the verbs expressing action in the italicized part of the instruction are stated in the disjunctive form. Under the decisions, that part of the instruction is for that reason erroneous, and taken alone, or where the error is not cured by other instructions given on the same subject, a very serious question is always presented. (*People* v. *Dole,* 122 Cal. 486, 492 [68 Am. St. Rep. 50, 55 Pac. 581].) But the first and latter parts of the instruction accurately state the rule and, as the objectionable part is used in immediate connection with the parts that are correct, we do not think the jury could have been confused as to the true rule. The defective part was cured by the parts of the instruction correctly stating the rule. (*People* v. *Fredoni,* 12 Cal. App. 686 [108 Pac. 663].) It would be most unreasonable to assume or believe that any intelligent person reading or hearing the instruction read would form the conclusion therefrom that a person innocently encouraging or aiding or assisting in the commission of a crime could be held liable for the perpetration thereof.

It is insisted that the instruction given by the court to the effect that if the jury found "beyond a reasonable doubt from all the facts and circumstances and evidence in this case, that at the time charged in the information herein, the defendants or either of them, were alone or acting in con-

cert with another or others, took and carried away the property mentioned in the information, or any part of it, the property of the complaining witness, . . . , from his person or immediate presence, and against his will, by putting him in fear as defined in these instructions, or by force and violence to his person, . . . , with the intent to deprive the said Litts of his ownership therein and convert the same to their or either of their own use, then you will find the defendants or either of them that you find so acted, guilty of the crime of robbery as charged in said information,'' is not applicable to any evidence in the case. The foundation of this claim arises from the assumption that there is no evidence in the record showing or tending to show that Ethel Anderson had any hand in the commission of the offense. We have, in effect, already answered this proposition in the declaration above that it was for the jury to determine from all the evidence whether the conduct of Ethel Anderson in connection with the transaction, as shown by the evidence, was such as to warrant the conclusion that she was a party to the conspiracy to rob Litts or take from him in a wrongful manner his personal property.

The defendants further complain of the action of the court in refusing to give a number of instructions requested by them. We have examined said instructions, and also the entire charge of the court, and so have found that every principle stated in the rejected instructions was covered by other instructions embraced within the charge as given by the court.

We have given this record, particularly the evidence herein, extended consideration because of the earnest insistence of counsel for the appellants that the evidence wholly fails to support the verdict, this point being specially emphasized as to the defendant Ethel Anderson. Indeed, our sole purpose in stating herein the testimony of the defendants was to show, as we think we have shown, that their statements under oath, as before suggested, bolstered, rather than disturbed, the case as made by the people. The verdict, in our judgment, is amply supported as to both defendants.

We have found no prejudicial error in the record and, accordingly, the judgment and the order appealed from are affirmed.

Burnett, J., and Finch, P. J., concurred.