[Crim. No. 1482.   First Appellate District, Division One.—December 5, 1928.]

THE PEOPLE, Respondent, v. CLIFFORD BURDG et al., Appellants.

Edmund Chevalier and J. O. Traber for Appellant Burdg.

Julius Hansen and J. C. Saylor for Appellant Trau.

U. S. Webb, Attorney-General, and Emery F. Mitchell, Deputy Attorney-General, for Respondent.

KNIGHT, J.—The appellants, Clifford Burdg and Mollie Trau, were charged jointly with having murdered the latter's husband, Philip Trau, and upon trial the jury found Burdg guilty of manslaughter and Mrs. Trau guilty of second degree murder. The appeals, which are taken from the judgments of conviction, are separately presented.

Insufficiency of the evidence to sustain the verdicts is one of the grounds urged for reversal by both appellants. As will hereinafter appear, however, the evidence is sharply conflicting, and such being the case the conclusions reached thereon by the jury are controlling. The following are the facts: Trau, the deceased, and appellant Mollie Trau lived in Fresno, and up to the date of the alleged homicide had been married less than six weeks. Trau was a special patrolman and worked nights. Mollie Trau and Burdg had known each other for upward of fifteen years, testimony having been introduced to the effect that at one time they lived together as husband and wife; also that since her marriage Mrs. Trau had been meeting Burdg at the home of her sister, Stella Moore, in the absence of her husband. Burdg was connected with an illegal liquor enterprise operating just outside of Fresno, and during the evening preceding the homicide had been drinking in company with Mrs. Moore and her husband, and Trau and his wife. Later, all five drove out to Burdg's place to obtain a gallon of liquor Trau had purchased from him, and while there Trau invited Burdg to spend the night at his house. On returning to town Trau got out of the machine where he worked and at his request the others drove to his house to await his return at 11:30 o'clock, when he would be home for supper. While they were waiting for Trau more liquor was consumed and at 10:30 o'clock the Moores went home, leaving Burdg and Mrs. Trau in the house alone. Trau arrived about an hour later, and after eating supper and

having a few drinks with Burdg, returned to work. His house consisted of a front bedroom, a dining-room, and a kitchen, the doorway between the bedroom and the dining-room being closed with curtains; and before leaving Trau stated that Burdg could sleep on the couch in the dining-room, and that he would be home at the usual time, about 5 o'clock in the morning. However, he returned unexpectedly about 2:30 o'clock and soon after he entered the house was instantly killed. Admittedly, the only persons present at the time were the appellants. The immediate cause of his death was a gunshot wound in the neck. There were no traces of powder marks on his body, and testimony was introduced to the effect that the wound he received could not have been self-inflicted. On the same day that the homicide was committed the officers searched an alley on which Trau's home abutted, and the vicinity adjacent thereto, and found in the alley three loaded cartridges and a pint flask of whisky; and about a month after the shooting the revolver with which the homicide was doubtless committed was found by a neighbor under an ash can in a back yard adjoining the alley. The revolver when found was "broken," and contained two shells, one loaded and the other discharged. The three cartridges previously found were of the same caliber as the revolver. The identity of the revolver was established as being one given to Trau by a friend about two months prior to the shooting, and Mrs. Trau admitted having kept it in a graphophone in the dining-room. It had a black fiber handle, and when found under the ash can one side of the handle was broken and part of the barrel was "bulged out."

Immediately following the shooting Burdg fled to the home of a friend, named Williams, about three miles distant from Trau's house, arriving there a little before 4 o'clock. He told Williams that Trau had committed suicide, and phoned to his employer to the same effect. Soon afterward Williams' hired man drove Burdg back to town, where he ate breakfast, and was then driven to the Moores. He told the Moores also that Trau had shot himself, and Moore accompanied Burdg back to Trau's house. Burdg waited outside while Moore went in the house, saw Trau's body lying on the floor, came out and told Burdg what he had seen, and then both drove back to the Moores. Soon afterward

Moore again accompanied Burdg back to Trau's house. Meanwhile Williams had notified the police, and they were at Trau's when Moore and Burdg arrived.

The police questioned Mrs. Trau and Burdg separately and both declared that Trau had shot himself, but their respective stories were self-contradictory and differed materially from each other as to the particulars in which each claimed the act was committed. Finally, after further questioning by the police, Mrs. Trau, whose mind at first seemed bewildered, changed her story completely and made a statement, which, in substance, she repeated at the trial, wherein she charged Burdg with having shot her husband during a drunken quarrel over her. At the trial Burdg also flatly contradicted his former statement as to the circumstances attending the shooting and gave testimony indicating that Mrs. Trau had shot her husband.

In this regard Mrs. Trau stated to the police upon their arrival at the house that night, and before Burdg returned with Moore the second time, that Trau had shot himself with a pearl-handled pistol which she said was somewhere on the floor; but no such weapon was found. She stated also that no one besides herself and husband was present at the time of the shooting, but a little later said that a man named Burdg was there. She claimed, however, that she could give no description of Burdg nor tell of his whereabouts because, as she said, she had met him only once or twice. At the trial she admitted that she knew when Burdg fled from the house where he intended going. When questioned further by the police, however, Mrs. Trau changed her story entirely and declared that the circumstances leading up to and attending the shooting were as follows: She stated that a heated argument took place between the two men when Trau returned for supper at 11:30 o'clock, because he found Burdg seated beside her on the couch with his arm around her, during which argument Burdg told Trau that if he wanted to get his wife away from him he could do so by killing him; that after her husband went back to work she and Burdg resumed drinking, and that a little later Burdg forced her to an act of sexual intercourse; that she threatened to tell her husband and Burdg declared: ''You won't get the chance to tell him; if you do I will kill him.'' Continuing, she said that when

her husband arrived unexpectedly about 2:30 o'clock she was lying on the bed in the front room and Burdg was reclining on the couch in the dining-room; that as her husband entered the front door she told him she wanted to speak to him, but he proceeded on through the house without stopping, and was followed into the kitchen by Burdg; that the two men began drinking and quarreling; that they cursed each other and scuffled, and she heard Burdg tell Trau that he loved her and "would have her, by God, if he had to kill him," immediately following which a shot was fired and Burdg rushed out of the kitchen through the house, past her, and out of the front door, concealing something under his coat. She said that thereupon she ran to the kitchen and found her husband lying on the floor wounded and unable to speak; that she dragged him into the dining-room, but being unable to lift him on to the couch, placed a pillow under his head, in which position the police found the body upon their arrival. She admitted, however, that she made no effort whatever to call help or summon medical aid, before the police arrived. While questioning her the police searched the bed in the front room and underneath the mattress they found Trau's pistol, cartridge belt and flashlight, which he carried on his person when he entered the house. The presence of these articles in the bed tended to dispute her assertion that upon entering the house her husband walked directly through to the kitchen where the shooting took place.

Burdg's two versions of the shooting were, in substance, as follows: When first questioned by the police he stated that he had seen Trau commit suicide under the following circumstances: That Trau was standing in the dining-room near a sewing-machine, when suddenly he reached over and took his pistol from underneath his coat, which he had previously laid on the sewing-machine, and shot himself; that immediately following the shot blood spurted from a wound in his neck, and he fell to the floor. Thereupon, Burdg said, he became frightened and fled. Later, during the same day, however, when taken back to the scene of the shooting by the police, it was clearly demonstrated to Burdg that his story of the shooting having taken place in the dining-room could not be true because no blood stains whatever were found on the dining-room floor near where

he said Trau had fallen; but that there was much blood on the floor of the kitchen where Mrs. Trau said the shooting had occurred; moreover, as stated, there were no powder marks on Trau's body, and his pistol, which was found in the bed in the front room, had not been discharged.

At the trial, Burdg retracted the former statements made by him as to the shooting, and testified that he had not seen Trau commit suicide; and that the shooting had not taken place in the dining-room, but had occurred in the kitchen under the following circumstances: He stated that twice during the night Trau and his wife had quarreled, first when Trau came home to supper, over the possession of the liquor, at which time Trau had taken his wife in the front room and spanked her; secondly, shortly before the shooting occurred, over the refusal of Mrs. Trau to go to bed, at which time Trau was in the kitchen, and Mrs. Trau and himself were in the dining-room; that during this latter quarrel Mrs. Trau arose from the couch on which she had been reclining, and walked over to and stood by a graphophone in the dining-room; that while she was standing there he saw Trau, who was still in the kitchen, reach over to a chair and grab his pistol from underneath his coat; that as he did so Mrs. Trau rushed toward the kitchen, saying: "Pinky (meaning her husband), drop that! Si (meaning Burdg), get out of the way!" That as she neared the kitchen a shot was fired, and that Trau fell to the kitchen floor with blood spurting from a wound in his neck.

Mrs. Trau claimed that when she made the false statements hereinabove set forth to the police she was intoxicated, and there is evidence tending to show that during the night she had been drinking. Burdg's explanation for changing his story was that at first he actually thought Trau had shot himself; that he "saw him grab for his gun and everything," but that he had forgotten "about her running to him, or anything like that, until several days after." Continuing, he stated, "After I got back to the jail there and they showed me the graphophone and told me there was a gun in the graphophone and everything and I got to thinking it over and thinking the way she was talking about me, that I did it, when she absolutely knew I did not do it, and the way her sister was saying, what she has said in the way it came out in the paper, I just got to wondering

why they would get up and lie about it like that unless they had a cause for lying, and then I remembered her being at that graphophone, and the story I have told now, . . . At the time I didn't know she had a gun or anything else in the house, and I didn't believe for several days that there actually was a gun there until I got to figuring it over." He was then asked by his counsel: "Did you think of this last story that you have related on the witness stand here . . . all at one time?" to which he replied, "No, I was quite a while studying it out, that is what I meant; it come to me along gradually, just the way it was, I remember her at the graphophone and everything, and I remember her shoving me to the side and hollering for him to drop that gun, and I actually did think the man had shot himself when it happened."

In addition to the foregoing facts and circumstances Burdg admits having run through the alley in his flight from the house, and that he may have "ditched" the flask of whisky which was later found there; and although he denied having had any quarrel with Trau, the evidence shows that following the shooting he bore a number of scratches and bruises about his forehead.

It would appear, therefore, from the testimony of appellants themselves, as well as from the surrounding circumstances established independent thereof, that Trau was shot and killed unlawfully by either one or the other of the appellants, and because of the many contradictory and obviously false statements in which both apparently entangled themselves, the jury, in our opinion, was justified in concluding that neither told the whole truth about the matter and that therefore, irrespective of the question of which of them actually fired the fatal shot, the other participated in the homicidal act, either actively or by aiding and abetting therein, and consequently was also guilty. And even though, as both appellants contend, it is not readily discernible from the evidence upon what theory the jury found one guilty of second degree murder and the other guilty of only manslaughter, it does not follow that the verdicts rendered are contrary to the evidence and the law, for the reason that manifestly the evidence would have been legally sufficient to sustain verdicts against both for the higher degree of crime, had such verdicts been

rendered, and therefore the fact that the jury may have dealt more leniently with Burdg than the evidence would seem to warrant does not furnish legal grounds for setting aside the verdict of second degree murder rendered against Mrs. Trau, and certainly gives Burdg no just cause to complain.

Appellant Burdg contends that the information is defective. It was drawn in conformity with the short form prescribed by section 951 of the Penal Code, as amended in 1927 [Stats. 1927, p. 1043], and appellant argues that it should have set forth circumstances from which it could be ascertained whether the crime charged was alleged to have been committed by "the joint act" of appellants or whether one was charged as an accessory, and if so, which one, citing section 950 of said code. We find no merit in the point. The form of information here followed was approved by the supreme court in the recent case of *People* v. *Coen,* 205 Cal. 596 [271 Pac. 1074], [Crim. No. 3139, decided November 26, 1928]; and, furthermore, section 971 of said code in terms abrogates all distinction between accessories before the fact and principals, and declares that all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense or aid and abet in its commission, although not present, "shall hereafter be prosecuted, tried, and punished as principals, and no other facts need be alleged in any indictment or information against such an accessory than are required in an indictment or information against his principal"; and in harmony therewith the courts have held that allegations of the kind here contended for are unnecessary (*People* v. *Rozelle,* 78 Cal. 84 [20 Pac. 36]; *People* v. *Nolan,* 144 Cal. 75 [77 Pac. 774]; *People* v. *Plum,* 88 Cal. App. 575 [265 Pac. 322]). Some suggestion is also made that said section 950, as amended, is violative of certain constitutional provisions, but appellant advances no argument to support such suggestion, and the constitutional provisions he cites apparently have no bearing upon the issue. In any event, the decision in the case of *People* v. *Nolan, supra,* effectively disposes of any such question.

Further contention is made that the court erred in refusing to direct the district attorney to elect whether he would proceed against appellants as principals or accom-

plices. But, as already pointed out, under section 971 of said code, irrespective of what their status in law may be, they must be "prosecuted, tried and punished" as principals; consequently, in such cases no election by the district attorney is required or permitted.

█ Appellants requested and were denied separate trials; and both assign the making of the order of denial as error. Section 1098 of the Penal Code provides, however, that where two or more defendants are jointly charged, "they must be tried jointly unless the court orders separate trials"; and in conformity therewith the courts have constantly held that on appeal the result of the exercise of such discretionary power will not be disturbed unless it clearly appears that such discretion has been abused (*People* v. *Erno,* 195 Cal. 272 [232 Pac. 710]; *People* v. *Perry,* 195 Cal. 623 [234 Pac. 890]; *People* v. *Remington,* 74 Cal. App. 371 [240 Pac. 526]; *People* v. *Booth,* 72 Cal. App. 160 [236 Pac. 987]; *People* v. *Anderson,* 59 Cal. App. 408 [211 Pac. 254]). We find no circumstances in the present case from which it could be reasonably concluded that the ruling complained of amounted to an abuse of discretion. It is true, the prosecution was allowed to introduce in evidence at the joint trial extrajudicial declarations made by the respective appellants out of the presence of the other, but this situation of itself does not give defendants jointly charged the absolute right to separate trials, because if such were the rule then in no case could there be a joint trial when part of the evidence against the joint defendants consisted of extrajudicial statements; █ furthermore, in the present case, the record discloses that in admitting said declarations the trial court in each instance carefully and properly instructed the jury to the effect that the rights of the absent party were to be in no way affected thereby; and we must presume, in the absence of a contrary showing, that the jury followed those instructions. (*People* v. *Prather,* 134 Cal. 436 [66 Pac. 589, 863].) █ And answering the complaint that on joint trial one appellant was allowed to testify against the other, it is sufficient to say that if they had been separately tried a like condition could have arisen.

Nor do we find any error in the giving or the refusal to give the instructions enumerated by appellants. █ The

one relating to the burden of proving circumstances of mitigation was worded in the exact language of section 1105 of the Penal Code and therefore was proper. (*People* v. *Caballero*, 41 Cal. App. 146 [182 Pac. 321]; *People* v. *Grill*, 151 Cal. 592 [91 Pac. 515]; *People* v. *Wilt*, 173 Cal. 477 [160 Pac. 561]; *People* v. *Miller*, 177 Cal. 404 [170 Pac. 817].) ■ Appellants' proposed instructions upon the law of extrajudicial statements were unnecessary because, as stated, during the course of the trial, whenever the court admitted such statements the jury was fully instructed as to the law upon the subject. ■ A number of instructions were also proposed by appellant Burdg and by the court refused, dealing with the law of accomplices, but such refusal was not error for the reason that the subject matter of the proposed instructions was substantially covered in those given.

■ The making of certain statements by the district attorney during the course of his argument to the jury is assigned as misconduct; but we think the matters objected to are not of sufficient importance to require special attention. ■ The range of discussion and argumentation of counsel before a jury is wide (*People* v. *Molina*, 126 Cal. 505 [59 Pac. 34]) and much must be left to the discretion of the trial court to say whether an attorney is overstepping the boundary of legal propriety. Most of the matters complained of related to inferences which, in our opinion, could be fairly drawn from the evidence, and therefore constituted proper subject for argument; and when the district attorney started upon a discussion of an "unsolved murder," which he claimed had once taken place in the county, he was promptly restrained by the trial court, and the jury instructed to disregard all remarks relating to it.

Finding no substantial error in the record, the judgments of conviction are affirmed.

Tyler, P. J., and Cashin, J., concurred.