[Crim. No. 6147. In Bank. Apr. 29, 1958.]

THE PEOPLE, Respondent, v. LOWELL LYONS, Appellant.*

*Reporter's Note: This case was previously entitled *"People* v. *Ferguson."*

Richard H. Cantillon, under appointment by the District Court of Appeal, Cantillon & Cantillon, R. Michael Cantillon and James P. Cantillon for Appellant.

Edmund G. Brown, Attorney General, Elizabeth Miller and William E. James, Deputy Attorneys General, S. Ernest Roll, District Attorney (Los Angeles), Jere J. Sullivan and Fred N. Whichello, Deputy District Attorneys, for Respondent.

SCHAUER, J.—Lowell Lyons (hereinafter called defendant), Paul Ferguson, and James Pope were charged by indictment (count 1) with conspiracy to commit burglary and to receive stolen property; defendant and Ferguson were further charged (counts 2 through 6) with five counts of receiving stolen property. Ferguson pleaded guilty as charged in count 2 and his cause was referred to the probation department for a report; his only appearance at the trial was as a witness for the prosecution. Pope and defendant pleaded not guilty. Pope went to trial with defendant but during the trial the one count against him (conspiracy) was dismissed on the People's motion and he was called as a witness for the prosecution.

A jury found defendant not guilty under counts 1, 2, and 3 and guilty as charged in counts 5 (receiving a stolen watch,

the property of Aaron Rothenberg) and 6 (receiving a stolen fur coat, the property of Donald Thomas Handy).† Defendant was sentenced to concurrent terms in the state prison. He presents numerous assignments of error, including the contention that there is insufficient evidence to corroborate the testimony of accomplice-witnesses. For the reasons hereinafter stated we have concluded that the matters complained of by defendant, subsequently detailed, either are not error or, in the circumstances, did not result in a miscarriage of justice (Cal. Const., art. VI, § 4½), except that defendant should have been sentenced for only one count of receiving stolen goods.

Ferguson, Pope, and Dann Rio, witnesses for the prosecution, were accomplices according to a possible view of their own testimony. The jury were instructed that if the crimes charged were committed by anyone, then these witnesses were accomplices as a matter of law and that the testimony of an accomplice is to be viewed with distrust and must be corroborated.

To show that there is inculpatory evidence apart from the testimony of the accomplices we first set forth a summary of such inculpatory evidence. Defendant himself testified as follows: He was a lawyer with practice largely in the field of criminal law. He represented Ferguson, who was charged in a federal case with conspiracy. On a number of occasions defendant accompanied Ferguson in the latter's car; on such occasions defendant would drive because he knew that Ferguson "was an ex-convict and couldn't drive an automobile legally." Through Ferguson defendant met James Pope under the alias of James England. Through "England" defendant met Dann Rio and undertook to represent Rio in a narcotics case. Rio gave defendant $100 as a retainer. Subsequently Rio informed defendant that he was unable to raise the additional fee and, according to defendant's testimony at the trial, on the night of April 7, 1955 (the night before defendant's arrest), Rio "handed me that watch [the subject of count 5] and told me it ought to be worth $50.00 off the fee . . . and although I had a watch at the time I did accept that watch from Mr. Rio." Mr. Rothenberg, the owner of the watch, testified that it was stolen from his house in a burglary committed during his absence sometime between April 2 and April 7, 1955. Officer Hooper testified

†Count 4 was dismissed.

that he questioned defendant at the city hall shortly after defendant's arrest; "I asked him to remove the property from his pockets; he put his property on the desk; in the property was a man's Helbros pocket watch. I asked him where he had gotten this watch, he said it was his, that he had had it for some time."

As to count 6, receiving a stolen fur coat, the corroborative evidence is as follows: The owner of the coat testified that it was stolen on the evening of April 7, 1955. Officer Roberts testified that on the morning of April 8, 1955, he saw defendant carrying a blue bag on which were the letters "PAA"; the bag was "stuffed full." Defendant was accompanied by Ferguson, who was carrying a beer carton. They entered the Crest Hotel. "[T]hree or four minutes" after defendant and Ferguson entered the hotel officers followed them to the room of óne Gallo. Officer O'Mara testified that he and the other officers entered Gallo's room. Defendant "said, 'Who are you?' I said, 'I am a police officer.' And I said, 'You are under arrest.' And he said, 'What for?' And I said, 'For investigation of stolen articles.' '' The beer carton was on the floor. On it lay a fur piece (not the subject of count 6). Also on the floor was the blue bag, closed. An officer opened it and found in it the fur coat which is the subject of count 6 and three white shirts.

Defendant testified that at least two of the shirts were his; that he had put them in the automobile in which he drove to the Crest Hotel; and that "to my knowledge" they were not in Gallo's room. Officer Hooper testified that when, shortly after defendant's arrest, the officer questioned defendant in the city hall, "I asked Mr. Lyons about the fur coats that had been found in the room, he said that he hadn't seen any fur coats, didn't know what I was talking about."

The accomplice Ferguson testified as follows: He met defendant in November, 1954. Thereafter Pope got in touch with Ferguson and met him about a dozen times when defendant was present. On April 7, 1955, Rio, Pope, Ferguson, and defendant were present at a conversation when Pope "stated how much he would like to get from that fur coat" (the subject of count 6); "for the fur coat and three pieces of jewelry he stated he would like it to bring $200.00." The next morning Ferguson took a fur coat in a beer carton and defendant took the fur coat which is the subject of count 6 in a bag initialed "PAA" to Gallo's room. Gallo "asked how much he was supposed to ask" for the furs; Ferguson

said $1,100; Gallo "said he would try to get that much, he wouldn't know until he saw his parties on the other end of the line . . . About that time the police officers came in and arrested us."

In February, 1955, while Ferguson was in the county jail he heard of one Newton Erwin, who was also in jail "and I had a sort of sympathy for the man, and he wanted to make bail and it seemed as though he didn't have any collateral to make bail. . . . I told Mr. Lyons that I thought Mr. Erwin was a very nice gentleman . . . , and if there was anything we could do to further his bond I would like to do it." At a subsequent conversation among Mr. Davila, a bail bond broker, Ferguson and Lyons, it was agreed that fur coats obtained from Pope would be "put up . . . as collateral for Mr. Erwin's bond," and this was done.

Ferguson further described the sale of a fur coat, negotiated by Ferguson and defendant, to a Mr. Millin. The proceeds of the sale were turned over to Pope.

Davila and Millin, respectively, corroborated the testimony of Ferguson concerning the transactions with them.

The accomplice Pope testified as follows: On March 17, 1955, he was introduced to defendant by Ferguson whom he had known for 12 years. In defendant's presence Pope "stated that I had numerous articles which I wished to dispose of. . . . Mr. Ferguson stated he could handle the matter for me. . . . I advised Paul [Ferguson] I had several furs and numerous small items of jewelry." There was not "any mention made as to where these articles came from." On March 18, 1955, in the presence of defendant, Pope turned over to Ferguson jewelry and furs. Ferguson "stated that he was not holding . . . That is a slang expression meaning broke. . . . I stated that I would give them a good break on the deal," that is, $200. "[I]n the course of the general conversation it was brought out that I was hot . . . that I had escaped." There was "general conversation" concerning burglaries and Ferguson "advised me to stay as low as possible, in view of the fact that I was an escapee, and . . . keep the heat on myself down to a minimum." There was conversation concerning obtaining identification for Pope under the name of James England at a cost of $50.

At a third meeting among defendant, Pope, and Ferguson, Ferguson paid Pope $200; Pope handed Ferguson $50 to obtain a driver's license and other identification; and Pope delivered jewelry and furs to Ferguson.

At a subsequent meeting among Ferguson, defendant, and Pope, Ferguson delivered to Pope a receipt for the application fee for a driver's license. Thereafter Ferguson delivered the license in the name "Robert Englund" to Pope.

Thereafter Pope committed various burglaries and stole furs and jewelry and delivered some of them to Ferguson in the presence of defendant. He delivered stolen furs to Ferguson in defendant's presence on "perhaps four" occasions. Among the items which he stole were the subjects of counts 5 and 6. He stole the watch and fur coat which are the subjects of those counts on April 7, 1955, and took them to Rio's apartment. Ferguson and defendant arrived and Pope gave defendant the watch "as an additional $25.00 fee against Mr. Rio's bill."

The accomplice Dann Rio testified that on April 7, 1955, he, defendant, Ferguson and Pope had a conversation in Rio's apartment "with reference to how much money we wanted for the fur pieces . . . [W]e agreed on the sum of $200 for it, that and some jewelry." The fur coat which is the subject of count 6 was put in a blue bag initialed "PAA" and carried from Rio's apartment; Rio did not remember who put the coat in the bag or who carried it from the apartment.

The rules concerning the sufficiency of evidence to corroborate the testimony of an accomplice are as follows: Section 1111 of the Penal Code, provides, in part: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof . . ."

The evidence need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged. (*People* v. *Brown* (1958), 49 Cal.2d 577, 583-584 [1, 2] [320 P.2d 5]; *People* v. *MacEwing* (1955), 45 Cal.2d 218, 223-225 [2, 3, 6, 7] [288 P.2d 257]; *People* v. *Santo* (1954), 43 Cal.2d 319, 327 [4, 7] [273 P.2d 249]; *People* v.

*Simpson* (1954), 43 Cal.2d 553, 563 [4, 5] [275 P.2d 31]; *People* v. *Gallardo* (1953), 41 Cal.2d 57, 62 [5, 6] [257 P.2d 29]; *People* v. *Barclay* (1953), 40 Cal.2d 146, 156 [13a, 14] [252 P.2d 321].)

Defendant does not attempt to controvert the evidence that the watch had been stolen and was in defendant's possession at the time of his arrest, but contends that there is insufficient corroborative evidence to show guilty knowledge that the watch had been stolen. ▮ As stated in *People* v. *Lopez* (1954), 126 Cal.App.2d 274, 278 [4] [271 P.2d 874], "[P]ossession of stolen property, accompanied by no explanation, or an unsatisfactory explanation of the possession, or by suspicious circumstances, will justify an inference that the goods were received with knowledge that they had been stolen. The rule is generally applied where the accused is found in possession of the articles soon after they were stolen." ▮ "False or evasive answers to material questions with reference to the ownership of stolen property tend to prove such knowledge." (*People* v. *Reynolds* (1957), 149 Cal.App.2d 290, 294 [2] [308 P.2d 48]; see also *People* v. *Cole* (1903), 141 Cal. 88, 90 [74 P. 547]; *People* v. *Boinus* (1957), 153 Cal.App.2d 618, 621-622 [1, 2, 3] [314 P.2d 787]; *People* v. *Malouf* (1955), 135 Cal.App.2d 697, 707 [8, 9] [287 P.2d 834]; *People* v. *Hartridge* (1955), 134 Cal.App.2d 659, 665 [6] [286 P.2d 72]; *People* v. *Boyden* (1953), 116 Cal. App.2d 278, 288 [12, 13, 14] [253 P.2d 773]; *People* v. *Jacobs* (1925), 73 Cal.App. 334, 339-343 [2, 3, 4] [238 P. 770].)

▮ The jury could find that defendant's statement to the police officer, shortly after his arrest, that the watch "was his, that he had had it for some time" was a consciously evasive and misleading explanation. Under the authorities cited above this is sufficient to show a consciousness of guilt and justify an inference that defendant received the watch with knowledge that it was stolen. (*Cf. People* v. *Wayne* (1953), 41 Cal.2d 814, 823 [4, 5] [264 P.2d 547].) It follows that such evidence tends to connect the defendant with the commission of the offense and satisfies the requirements of section 1111 of the Penal Code. (*People* v. *Santo* (1954), *supra*, 43 Cal.2d 319, 327 [9].)

▮ As to the fur coat which is the subject of count 6 the jury could find that defendant falsely stated "that he hadn't seen any fur coats, didn't know what I was talking about." The trier of fact was entitled to believe that defendant had the fur coat in his possession under suspicious circumstances,

yet, when questioned concerning that possession, offered no innocent explanation but rather falsely denied the fact of possession. Denial of possession of the goods, if such denial is shown to be false, is a persuasive circumstance tending to show guilty knowledge. (*People* v. *Hartridge* (1955), *supra,* 134 Cal.App.2d 659, 665 [6]; *People* v. *Boyden* (1953), *supra,* 116 Cal.App.2d 278, 288 [13].)

■ It is true that much of the evidence stated above was controverted. But, as stated in *People* v. *Henderson* (1949), 34 Cal.2d 340, 346-347 [6] [209 P.2d 785], "When as in the present record it is discovered that there is testimony aside from that of the accomplice which tends to connect the defendant with the commission of the crime, the function of the appellate court is performed. Questions of the weight of the evidence and the credibility of the witnesses are for the trial court, and since the circumstances reasonably justify the finding of guilt, an opposing view that they also may be reconciled with innocence will not warrant interference with the judgment on appeal." Regardless of how we might think we would resolve the conflicts if we were initially trying the issues of fact, our duty in the appellate function is clear.

■ This is true also as to uncertainties in Pope's testimony as to just when defendant was present when Pope delivered stolen property to Ferguson. (See *People* v. *Daugherty* (1953), 40 Cal.2d 876, 885 [4, 5] [256 P.2d 911]; *People* v. *Newland* (1940), 15 Cal.2d 678, 680-684 [1] [104 P.2d 778], and cases cited.)

Officer Roberts testified during the People's case in chief that when defendant and Ferguson went into the Crest Hotel "Mr. Lyons was carrying a cardboard box and Mr. Ferguson was carrying a blue handbag with the letters PAA on the side." Then in answer to the question, "This blue bag that you say Lyons was carrying, did it appear to have anything in it?" the witness answered, "Yes, it was stuffed full." On rebuttal Officer Roberts corrected his testimony, stating that "Mr. Lyons was carrying the blue bag with the PAA, and Mr. Ferguson the box." Defendant's counsel objected to this rebuttal testimony. He said, "There is apparently a conflict, and that is why we had these witnesses excluded. [There was an order for exclusion of witnesses from the courtroom when they were not testifying.] Now he is bringing him back in and the witness is changing his testimony." The court ruled, "If the witness wants to explain any mistaken

statements made, made in error, he may do so at this time.''
On cross-examination on rebuttal Officer Roberts testified
that on the night before his rebuttal testimony Officer Hooper
called his attention ''to the mistake that was in the tran-
script.''

 Defendant asserts that Officer Roberts ''After admit-
ting that he had violated the trial court's order sequestering
the witnesses, in that he had discussed his testimony with Sgt.
Hooper, changed his testimony in this respect.'' The appraisal
of the effect of this change in testimony on Officer Roberts'
credibility was for the trier of fact.

Defendant urged that the verdict of not guilty as to the
conspiracy count was inconsistent with the verdicts of guilty
as to counts 5 and 6 because among the overt acts charged
in the conspiracy count were the possession by defendant of
the articles which are the subjects of counts 5 and 6.
 ''[T]he overwhelming weight of authority is that the
acquittal of a defendant of the crime of conspiracy to commit
a crime is not a bar to a subsequent prosecution of said de-
fendant for the commission of said crime, even though said
crime is alleged in the conspiracy indictment as the sole overt
act committed in furtherance of the conspiracy.'' (*People* v.
*MacMullen* (1933), 218 Cal. 655, 656 [1] [24 P.2d 793];
*People* v. *Lyon* (1955), 135 Cal.App.2d 558, 586 [19] [288
P.2d 57], and cases cited [conviction of conspiracy does not
place defendant in double jeopardy when he is subsequently
prosecuted for the main crime].) It follows that
acquittal of conspiracy here is not inconsistent with convic-
tion of substantive offenses of receiving stolen goods. De-
fendant could, in fact, be guilty of receiving stolen goods
without having conspired to receive them. (*Cf. People* v.
*Keyes* (1930), 103 Cal.App. 624, 632, 646 [284 P. 1096].)

On cross-examination of Officer Hooper defense counsel
asked, ''Now, how many times from the 8th of April, 1955,
to this day have you talked to Mr. Pope?'' An objection that
this was ''outside the scope of direct examination'' was sus-
tained. Defense counsel stated, ''it is on the limited proposi-
tion of motive that I am offering it—bias, prejudice'' and
the court replied, ''I think the ruling will stand.'' In his
brief defendant asserts, ''That he [Officer Hooper] had con-
tacted the witness Pope an unusual number of times, wined
and dined with him would go to show that prejudice.''
However, defense counsel did not make an offer of proof in
the trial court that he was attempting to show an unusual

number or type of meetings between Hooper and Pope; defense counsel's question of Hooper might only have elicited the information that Hooper talked with Pope on a number of occasions in the ordinary course of his investigation.

Where the question does not show on its face whether or not it is material, the questioner, in order to claim error in sustaining an objection thereto, must reframe it or make offer of proof to show its materiality. (*People* v. *Singh* (1920), 182 Cal. 457, 482 [19] [188 P. 987] ; *People* v. *Monson* (1951), 102 Cal.App.2d 308, 313 [6, 8] [227 P.2d 521] ; *People* v. *Fredeen* (1950), 101 Cal.App.2d 105, 107-108 [4] [224 P.2d 849] ; *People* v. *McDonald* (1930), 110 Cal.App. 183, 187 [3] [293 P. 883] ; see *People* v. *Brown* (1941), 43 Cal.App.2d 430, 433 [110 P.2d 1059].)

Defendant's contention that the deputy district attorney was guilty of prejudicial misconduct is likewise without merit. In the course of his argument to the jury the deputy district attorney stated: "Remember, ladies and gentlemen, Mr. Haley [an attorney who permitted Ferguson to store property on his premises] is not on trial here. *Maybe this is a good point to bring up right now, but it is not the function of the District Attorney's office to go around recklessly indicting people and bringing charges against them. Our duties are not to prosecute people just for the sake of making prosecutions.* It is our duty to protect the citizens of the County against crimes.

"If the evidence disclosed that Mr. Haley actually had possession of that property, knowing it to be stolen, then the Grand Jury might have indicted Mr. Haley. But they did not. Do we have any evidence that Mr. Haley associated with Mr. Pope and Mr. Ferguson, as we have against Mr. Lyons? Do we have any evidence that Mr. Haley went to their homes, as we have against Mr. Lyons? Do we have any evidence that Mr. Haley acted as their mouthpiece, as we have against Mr. Lyons? If Mr. Haley was a party to a crime, proper governmental agencies will take care of that, but right now we are concerned only with Mr. Lyons. And when they say, 'Here is another attorney who did all this. In other words, I am not the only person dipping my fingers into the till. Why don't you get these other people?' Well, he is the only one here on trial and we are not concerned with anyone else." (Italics added.)

Although no objection was made at the trial, defendant now

contends that the italicized portion of the above statement constituted prejudicial misconduct in that it implied to the jury that the deputy district attorney had extrajudicial knowledge of defendant's guilt. ▇▇▇ As stated in *People v. Berryman* (1936), 6 Cal.2d 331, 337 [57 P.2d 136], "The general rule regarding misconduct of the district attorney which tends to and is likely to result in prejudice to the defendant is that where no objection is made to such misconduct by the defendant, or where objection is made and the court sustains the objection and properly admonishes the jury, the misconduct claimed to be prejudicial to defendant's rights will not furnish grounds sufficient to justify the granting of a new trial or the reversal of the judgment. [Citation.] ▇▇▇ There are two exceptions to this general rule. One is where the case is closely balanced and there is grave doubt of defendant's guilt, and the acts of misconduct are such as to contribute materially to the verdict, a miscarriage of justice results requiring a reversal. [Citation.] The other exception is where the act done or remark made is of such a character that a harmful result cannot be obviated or cured by any retraction of counsel or instruction of the court. In such cases the misconduct will furnish ground for a reversal of the judgment, even where proper admonitions are given by the court. [Citations.]" ▇▇▇ Whether a prosecutor has been guilty of prejudicial misconduct must be determined in the light of the particular factual situation involved. Previous authority is of little help. Suffice it to say that the conduct of the deputy district attorney here involved, did not approach the extraordinary misconduct revealed in such cases as *People* v. *Kirkes* (1952), 39 Cal.2d 719, 723-724 [1-4] [249 P.2d 1]; *People* v. *Vienne* (1956), 142 Cal.App.2d 172, 173 [2a] [297 P.2d 1027]; *People* v. *Teixeira* (1955), 136 Cal. App.2d 136, 147-148 [288 P.2d 535]; and *People* v. *Talle* (1952), 111 Cal.App.2d 650, 673-677 [8-12] [245 P.2d 633], cited by defendant. Nor is this a case such as *People* v. *Hale* (1947), 82 Cal.App.2d 827, 838 [187 P.2d 121], where the trial court failed to sustain defendant's objections to the improper statements of the prosecuting attorney and made comments which tended to classify the prosecutor's remarks as a summation of the testimony and the inferences to be drawn therefrom.

▇▇▇ In the subject case, just before making the above quoted remarks, the deputy district attorney posed the question, "Why isn't Mr. Haley [a prosecution witness] in here

as a defendant?'' This rhetorical question apparently related back to the fact that a defense attorney argued that ''The only reason Mr. Haley is immunized is because he is putting Mr. Lyons in this case.'' The other defense counsel argued that ''Mr. Haley said he did not know Mr. Pope. . . . Yet he had all this property . . . Mr. Pope had stolen, he had it all in his house.'' Whether or not Mr. Haley was an accomplice, the fact is that his testimony was not implicatory. Thus when considered in context the italicized portions of the prosecutor's remarks appear to fall within the scope of proper argument as an answer to the implications of defense counsel that Haley should have been prosecuted and to constitute an attempt to clarify for the jury matters which might have confused them. (*Cf. People* v. *Perkin* (1948), 87 Cal.App. 2d 365, 367-369 [2] [197 P.2d 39].) Any inference to the effect that the deputy district attorney had extrajudicial knowledge of the defendant's guilt is slight and was certainly susceptible to cure by admonition.

The foregoing remarks are equally applicable to other statements, set out below, which defendant contends indicated to the jury that the prosecutor had extrajudicial knowledge of the defendant's guilt.

██ In his argument to the jury the district attorney also stated: ''And there has been only the insinuation, the insinuation that all of the People's witnesses who were accomplices or in any way connected with the defendant, were allowed to plead guilty to only one or two Counts. Ladies and gentlemen of the jury, that is a matter, I believe, of common knowledge, that if there are three or four Counts against some defendant, that defendant is permitted to take a plea to one or more of the Counts. And even after three days of trial they allowed Mr. Moeckel to plead guilty to two Counts of Robbery. Why? It is obvious. In his sentence the Judge made the sentences run concurrently. Why try him on two or three or four Counts when he can be found guilty on one Count, or when he pleads guilty to one or two Counts? The Judge made the sentences run concurrently. *If we took a plea of two Counts against Pope and one Count against Mr. Ferguson, the big receiver, we will offer Mr. Lyons the same consideration. If at any time during this trial he wanted to plead guilty to one Count, or if he would like to do so even now, we will give him the same consideration.''* (Italics added.) The court sustained defendant's objection to the italicized portion of the prosecutor's remarks and instructed

the jury "to disregard the statement of counsel regarding any offer to accept a plea from Mr. Lyons." Defendant now argues that the admonition was insufficient to cure the error. In the light of the circumstances indicated above, the contention is without merit.

In the concluding phase of his closing argument the deputy district attorney stated: "And some of the jewelry is not in evidence. And the reason for that is because we could not show Mr. Lyons' connection with the other fur coats or with the other jewelry. The fur coat carried in this bag, . . . and that is here, but the fur coat carried by Mr. Ferguson in that cardboard box is not here because we cannot show Mr. Lyons' connection with that fur coat. . . . The reason the other furs are not here is because we could not connect Mr. Lyons with them." Defendant made no objection at the time but now contends the remarks implied to the jury that the prosecutor had personal knowledge of defendant's guilt. The contention is without merit. Defense counsel had earlier called the jury's attention to the fact that certain items referred to in the testimony had not been introduced into evidence. The remarks of the deputy district attorney were a legitimate explanation to the jury why such items had not been introduced. Even if we should assume that the remarks were improper their substance cannot be said to have contributed materially to the verdict.

The deputy district attorney also argued as follows: *"But it is evident, ladies and gentlemen, that if anyone would have been given consideration by the Police Department, it would have been the son of a former policeman. They would not discriminate against a policeman's son.* On the contrary, it seems to me that they would have gone all out to give him every break possible.

"Mr. Cantillon [an attorney for the defendant] referred to 'Inspector Lyons' but I don't know what his father was. But I do know that the evidence has certainly shown the defendant is not a chip off the old block." (Italics added.) Defendant interposed no objection but now contends the italicized portion of the prosecutor's remarks amounted to an avowal of his personal belief in defendant's guilt. However the statements of the prosecutor are a mere assertion of what he claimed was "evident" or that "the evidence has certainly shown," and were made in answer to defense counsel's assertions to the effect that defendant had incurred the wrath of the police department by bringing several suits

against its members and the police were out to "settle" defendant "once and for all." No error appears in this instance.

Defendant also urges that the deputy district attorney committed prejudicial misconduct by twice referring to the defendant as the "mouthpiece" for his accomplices. No objection was interposed at the trial. The term carries an unsavory connotation in the minds of many persons. Its use was improper and should not be condoned. However, under the facts of this case, it does not appear that any different verdict would have been probable had the deputy district attorney not used the term. It follows that its use is not ground for reversal. (*People* v. *Watson* (1956), 46 Cal.2d 818, 835, 836 [12] [299 P.2d 243].)

Defendant contends that he was denied a fair trial in that the district attorney and superior court coerced the accomplices to testify untruthfully against him. This claim is not substantiated by the record. It does appear that the accomplices pleaded guilty to certain charges brought against them and that the court postponed their sentencing from time to time until after they had testified for the prosecution against defendant. This fact was brought out upon cross-examination and the prosecutor frankly admitted to the jury that "inducements" had been offered the accomplices for their testimony. The "inducements" obviously were promises of reduced sentences. These facts go to the credibility, not the competency, of the accomplices' testimony. (*People* v. *Pantages* (1931), 212 Cal. 237, 252-259 [8, 9, 10] [297 P. 890].) They furnish the defendant with a powerful weapon for attacking the credibility of the inherently suspect witnesses but since the jury were fully apprised of the facts and section 1111 of the Penal Code was satisfied, we cannot hold that the trial is shown to have been unfair in fact or in law.

Defendant, however, urges that since the proffered leniency was obviously conditioned on the accomplices' first testifying against defendant, that testimony was worthless as a matter of law, relying primarily on *People* v. *Green* (1951), 102 Cal.App.2d 831 [228 P.2d 867], and cases therein discussed. But in that case the promise of immunity was conditioned on the accomplice's testimony resulting in the conviction of the defendant. The Green case recognizes, at page 838 of 102 Cal.App.2d, that, "It is a practice which seems to be approved in all jurisdictions, if the ends of justice

will be thereby served, to extend immunity to one jointly charged with crime, upon condition that he testify fully and fairly as to his knowledge of the facts out of which the charge arose.'' There is nothing in the present case to indicate that the promises of leniency were conditioned on anything other than the accomplices testifying fully and fairly as to their knowledge of the facts out of which the charges arose. It follows that the accomplices' testimony was not so inherently incredible as to result in incompetency.

Defendant relies upon the statement in *People* v. *Walther* (1938), 27 Cal.App.2d 583, 591 [7] [81 P.2d 452], that ''When a codefendant who is a coconspirator has been offered immunity from prosecution in reward for his testimony, the cause should be promptly dismissed against him. Otherwise, the maintenance of the action against him throughout the trial may serve to intimidate the witness and furnish an inducement for him to color his testimony.'' We may assume that it would be better practice, lending credibility to the accomplices' testimony, to have promptly *sentenced* them, but we cannot believe that the failure so to do was so serious a matter that it deprived defendant of a fair trial.

■ Defendant complains of the trial court's failure to sustain his objection to, and to grant his motion to strike, the testimony of Joseph Kurrus, a process server for the district attorney. Kurrus testified that he twice served a subpoena on Ernest Gallo, the person in whose room defendant was arrested, to appear at the trial, and that he again attempted to serve him but could not find him. Gallo did not appear at the trial. The prosecuting attorney in argument said, ''I would like to have had Mr. Gallo here . . . to clear up some of the inconsistencies in the defendant's story, but we have been unable to locate him, although we have tried diligently.'' Defendant argues that Kurrus' testimony was presented to confuse the jury and cast suspicion on defendant by an implication that Gallo's testimony would be favorable to the prosecution. Gallo's testimony would clearly have been material. Although there is no showing that it would have been favorable to the prosecution, the prosecution was entitled to explain why Gallo was not produced, to forestall any question which might arise in the minds of the jury as to why Gallo did not testify. (See *People* v. *Clark* (1895), 106 Cal. 32, 38 [39 P. 53] ; *People* v. *Schunke* (1934), 140 Cal.App. 544, 549 [35 P.2d 388].)

■ Defendant complains that the trial court erred in

permitting questioning of Officer Hooper, in rebuttal, by reading to him portions of a conversation from a transcript and asking him whether the conversation occurred. To show that defendant made extrajudicial statements contrary to his testimony the following occurred on cross-examination of defendant: He was asked if he recalled being questioned on April 8, 1955, about 4 p. m. in the presence of Mr. Gallo and Officers O'Mara, Farquarson, Scheidecker, and Hooper and answered that he did. Defendant was then asked if he recalled the following portion of the conversation: ''Mr. Gallo made a statement, and after that O'Mara said to Gallo, 'Now, you told us that he brought them over to have you sell them for him.' And Gallo said, 'That's right. At first I thought the coats were not stolen. In fact, I didn't think they were stolen because I didn't think he would be jeopardizing himself.' And you said, 'Of course not.' And Gallo said, 'I didn't tell him where they came from, because I didn't know where they came from.' And you said, 'I thought his laundry was in the box.' And Farquarson said, 'Whose laundry?' And you said, 'Ferguson's laundry.' '' The only answer which defendant gave to the above quoted question was, ''I never said 'Ferguson's laundry' at any time. Hooper said that.''

Defendant was asked if he recalled the following portion of the conversation: ''Then Gallo said: 'Don't try to put the blame on me,' and then Hooper said to you: 'Is this man lying about the whole affair, then?' . . . You said: 'Now, look, the man may have had thoughts about it, the man is not a liar, but I did not have a conversation with him about selling furs.' '' Defendant answered, ''I did not say that, no. He [Hooper] called Mr. Gallo a damned liar at that time.''

On rebuttal, when Officer Hooper was testifying, the prosecuting attorney identified the foregoing conversation and asked, ''During that conversation, sir, were the following questions asked and the following answers given——'' Defense counsel objected on the ground ''that that is leading and suggestive.'' The objection was overruled and the examination proceeded as follows:

''Q. By MR. STOVITZ [prosecuting attorney]: Mr. Lyons said, 'I thought his laundry was in that box,' and Officer Farquarson said, 'Whose laundry?' And Mr. Lyons said, 'Ferguson's laundry.'

''Were those questions asked and did Mr. Lyons say, 'Ferguson's laundry?' A. Yes, he did.

"Q. During that conversation, sir, were the following questions asked and did Mr. Lyons make the following answers, Mr. Lyons made the statement, 'No, I don't recall hearing it,' and Gallo said, 'Don't try to put the blame on me.' And you said to Mr. Lyons, 'Is this man lying about this whole affair, then?' And Lyons said, 'Now, look. The man may have had thoughts about it. The man is not a liar, but I did not have a conversation with him about selling furs.'

"Mr. Richard Cantillon [defense counsel]: That is objected to as improper cross-examination.

"The Court: It is rebuttal.

"Mr. Stovitz: Yes, this is rebuttal, your Honor. I asked Mr. Lyons that question.

"Q. Did Mr. Lyons make that statement at that time, 'No, now, look. The man may have had thoughts about it. The man is not a liar, but I did not have a conversation with him about selling furs.'

"Mr. Cantillon: I will object to that, your Honor, on the ground it is leading and suggestive. I don't know why we just don't ask the officer what was said. He is reading from a transcript . . . and all he does is answer 'Yes' every time he asks him a question. . . . [This question was not answered.]

"Q. By Mr. Stovitz: Were the following questions asked and did Mr. Lyons give the following answers—you, Mr. Hooper, made the statement: 'The first you knew that he had more than one fur was when you saw this darker-colored fur?'

"Mr. Gallo said: 'The following morning at my place.'

"And you said: 'I see you are nodding your head, Mr. Lyons. Does that mean you are agreeing with the story?'

"And Mr. Lyons said: 'No, no. We had a long conversation that Wednesday night. A discussion was had about many different subjects. I never had these two items in my possession at any time. We were just having a conversation. I never offered those for sale. Ferguson had them in the box. I don't know what Ferguson had.'

"Was that statement made, sir? A. Yes, it was."

While the questioning was somewhat confusing, and the so-called rebuttal is not all strictly rebuttal, it is apparent that defendant could not have been prejudiced in this regard.

 Officer O'Mara was called on rebuttal and testified that the conversation in question was recorded and that the transcript thereof from which the prosecuting attorney read·as

above quoted was typed by a clerk in his presence. Without objection he testified affirmatively to the question whether defendant made the statement that he thought Ferguson's laundry was in the box.

On cross-examination of O'Mara the following occurred:

"Q. Can you tell me who drew a line through the name Lyons before the semi-colon and the words, 'I thought his laundry was in that box,' sir? (Showing document to the witness.) Who drew this line straight through the middle of the word Lyons? A. I don't know.

"Q. Who wrote out in the paragraph opposite that statement and apparently erased the word 'Gallo'? A. I don't know. It is not my writing."

Defendant complains that the transcript was altered. But there is nothing in the record which shows that the transcript was not altered to correct it so that it would reflect the truth.

Further cross-examination of defendant from a transcript of his questioning by Officers Armstrong and Hooper and further cross-examination concerning the questioning of defendant in Gallo's presence at 4 o'clock on April 8, could not have been error prejudicing defendant.

■■■ Defendant asserts that the prosecution wilfully suppressed "vital finger print evidence." The factual basis of this contention is as follows: The accomplice Pope testified that he paid Ferguson a total of $100 for which Ferguson obtained a driver's license for Pope under the name "Robert Englund"; that Ferguson told Pope that "a person who answered my general description" had applied for the license; Pope believed that defendant was present during some of the conversations which led to the obtaining of the false license. The license was received in evidence at the request of defendant but marked as a People's exhibit. Defendant called Officer Hooper to the stand and he answered negatively questions whether he had caused an examination of the thumb print and signature on the license to be made and whether he had any idea whose thumb print and handwriting appeared thereon. To the question "And as you sit there now you have no idea who wrote on that application?" Officer Hooper testified, "No, I don't." The prosecuting attorney said, "That's objected to, your Honor, as being immaterial unless he has an idea as to who caused it. We all have an idea after listening to the evidence." The court ruled, "Well, the answer may stand."

It is defendant's position that the People suppressed the evidence that the thumb print was not that of defendant and that the prosecuting attorney, by his statement, ''We all have an idea after listening to the evidence,'' implied that the thumb print was that of defendant. This argument is manifestly without merit. No such implication appears from the prosecuting attorney's statement; rather, ''after listening to the evidence'' it would appear that Ferguson obtained the license for Pope on application of an unidentified person ''who answered [Pope's] . . . general description.'' If defendant thought that any implication arose that the thumb print was his, he was not prevented from offering evidence that it was not.

As previously stated, Officer Hooper testified that when defendant was questioned about the watch he ''said it was his, that he had had it for some time.'' Defendant testified that he did not make such a statement. ▇▇ On defense counsel's cross-examination of Officer Hooper he testified that the interrogation of defendant was recorded but that he did not have a transcript of the conversation concerning the watch which is the subject of count 5. Asked whether the conversation concerning the watch was recorded, Hooper answered, ''No, I don't know whether that portion was recorded or not.'' Defendant argues that ''it was manifest injustice for the police, and District Attorney, to suppress this recording. Obviously, a play-through of it would have exonerated the Appellant, and supported his statement that he made no such utterance. . . . It is inherently improbable that this part of the supposed recordation was not made. . . . If there was a record, it should have been produced and played for the jury.''

There is nothing in the record to support defendant's assertions that this portion of the conversation was recorded and the recording suppressed. The conversation occurred immediately after defendant was taken to the office of the police, and it may well have been that the recording of defendant's questioning had not commenced. In the absence of some factual support therefor, defendant's charge that a tape recording was deliberately suppressed is not well taken.

▇▇ Defendant complains that the jury were not instructed that private transactions are presumed to be fair and regular (Code Civ. Proc., § 1963, subd. 19) and that the court ''gave no instruction embodying the principle that a defendant is presumed to speak the truth and that unless

the presumption is destroyed by the evidence, the jurors are required to find that a defendant has spoken the truth.'' The record does not disclose that defendant requested any such instructions. But defendant complains that although there was abundant evidence presented by defendant concerning his relationship to the persons connected with the case the court gave no instruction at all covering the standard to be adopted by the jury in weighing defendant's explanation.

It is true that there was no instruction specifically directed to defendant's explanation of events as opposed to that of any other witness. But the court instructed the jury at length concerning the appraisal of the credibility of witnesses. Among other things the jury were told that ''A witness is presumed to speak the truth. This presumption, however, may be repelled by the manner in which he testifies; his interest in the case, if any, or his bias or prejudice, if any, for or against any of the parties; by the character of his testimony, . . . or by contradictory evidence.''

▉ ''It has been repeatedly held to be improper for the court to single out a particular witness and to charge the jury how his evidence should be considered. [Citations.]'' (*People v. McDonnel* (1949), 94 Cal.App.2d 885, 889 [5] [211 P.2d 910]; accord, *People v. Emmett* (1932), 123 Cal.App. 678, 683 [7] [12 P.2d 92]; *People v. Quon Foo* (1922), 57 Cal.App. 237, 241 [6] [206 P. 1028].)

▉ Defendant's requested and refused instruction that ''The fact that an indictment has been filed . . . is not to be considered by you . . . on the proposition of the guilt or innocence of this defendant'' and that the plea of not guilty raises the presumption of innocence, was covered by other, more accurate instructions.

▉ Defendant complains of the refusal of the following instruction: ''Where the District Attorney has arbitrarily selected one or more alleged co-conspirators to whom he has tendered immunity from prosecution in reward for his [turning] State's evidence against his alleged collegue, such evidence is open to suspicion, and under such circumstances the testimony of an alleged co-conspirator should be examined with great care.'' The substance of this instruction was covered by the following instructions which were given:

'' [T]he testimony of an accomplice ought to be viewed with distrust. This does not mean that you may arbitrarily disregard such testimony, but you should give to it the weight

to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case.''

The presumption that a witness speaks the truth ''may be repelled by . . . his interest in the case, if any, or his bias or prejudice, if any, for or against any of the parties. . . .''

Defendant complains that the trial court did not of its own motion instruct the jury that ''the alleged admission of the defendant could not itself be used to establish guilt, nor could such admission be used unless the corpus delicti of the crime charged be independently proved.'' Defendant cites *People* v. *Frey* (1913), 165 Cal. 140, 147 [131 P. 127], where it was held error for the court to fail to instruct as to ''the true rule with reference to the admission of confessions and the necessity for independent proof of the *corpus delicti.*'' But it has been held that failure to instruct that proof independent of the extrajudicial statements of defendant is necessary to prove the corpus delicti, although error, is not reversible where there was evidence independent of such statements. (*People* v. *Clark* (1953), 117 Cal.App.2d 134, 141 [4] [255 P.2d 79] ; *People* v. *Chan Chaun* (1940), 41 Cal.App. 2d 586, 592 [8] [107 P.2d 455].)

The uncorroborated testimony of the accomplices was sufficient to establish the corpus delicti. (*People* v. *Pearson* (1939), 111 Cal.App.2d 9, 28 [37] [244 P.2d 35] ; *People* v. *Snyder* (1925), 74 Cal.App. 138, 143-144 [5] [239 P. 705].)

We are satisfied that in the circumstances of this case the failure of the court, of its own motion, to give the subject instruction was not prejudicial error.

Defendant complains that without the request of the jury armed guards took the exhibits, including the allegedly stolen property, into the jury room; that this was an improper influence on the jury which unfairly induced them to believe that the property was stolen. The only support in the record for this argument is the following entry in the clerk's minutes: ''the jury retires for its deliberations. Without the presence of the jury, and with defendant and his counsel and the Deputy District Attorney present, defendant objects to jury having the exhibits with them and moves that the exhibits be withdrawn from the jury under PC 1137. The motion is denied and all exhibits that are admitted in evidence are permitted to be taken by the jury to the jury room.''

Section 1137 of the Penal Code provides, ''Upon retiring for deliberation, the jury may take with them all papers (ex-

cept depositions) which have been received as evidence in the cause, or copies of such public records or private documents given in evidence as ought not, in the opinion of the court, to be taken from the person having them in possession. . . ." Defendant concedes that the jury may also take clothing which had been introduced in evidence into the jury room (citing *People* v. *Hower* (1907), 151 Cal. 638, 645-646 [91 P. 507]; *People* v. *Mahoney* (1888), 77 Cal. 529, 531-532 [20 P. 73]). In *People* v. *Van Skander* (1937), 20 Cal.App.2d 248, 255-256 [8] [66 P.2d 1228], the prosecuting attorney, during argument, handed exhibits to the jury without request and told them that they could take the exhibits into the jury room with them. Defendant's contention that there was error in handing exhibits to the jury without their requesting them was rejected. In *People* v. *Morales* (1943), 60 Cal.App.2d 196, 198 [2] [140 P.2d 461], the clerk, without the jury having made any request for exhibits, handed them to the jury. Defendant contended that it was error for this to have been done without a specific request by the jury. The appellate court says, "Assuming, but not holding, that any error appears no prejudice is shown and any possible error in this regard would not justify a reversal."

Here, assuming that the exhibits were taken into the jury room by "armed guards" without request by the jury, we are not prepared to hold that such conduct was error. It does not appear that such conduct could exert any improper influence on the jury, or could influence them to believe that the assertedly stolen exhibits were in fact stolen.

 Defendant contends that his motion for a severance of his trial from that of Pope should have been granted. He complains that the number of challenges to the jury was limited and that the psychological effect of Pope's arising from the defense end of the counsel table and testifying against defendant was damaging to defendant. There is no showing that defendant exhausted his peremptory challenges to the jury. Therefore, it does not appear that he was prejudiced in this regard. (See *People* v. *Griffin* (1950), 98 Cal. App.2d 1, 49 [25] [219 P.2d 519].) Nor do we believe that defendant was prejudiced by the fact that Pope sat at the defense end of the counsel table before testifying against defendant. It should be noted that if defendant and Pope had been tried separately Pope could have testified against defendant. (*People* v. *Burdg* (1928), 95 Cal.App. 259, 268 [6] [272 P. 816].)

■ Defendant asserts that there was a fatal variance between the pleading of count 6 of the indictment and the proof in that the proof established that defendant was guilty of burglary as a conspirator rather than of receiving stolen property. Defendant relies upon the Texas law that if there is a conspiracy pursuant to which a thief steals and delivers property to defendant, and there remains some act to be done by defendant with the property pursuant to the common design, defendant is guilty as a thief and cannot be convicted of receiving stolen property. (*Evans* v. *State* (1948), 152 Tex.Crim.Rep. 58 [211 S.W.2d 207, 209 [6]]; *McInnis* v. *State* (1932), 122 Tex.Crim.Rep. 128 [54 S.W.2d 96, 98 [2, 3]]; *Byrd* v. *State* (1931), 117 Tex.Crim.Rep. 489 [38 S.W.2d 332, 333-334].) It is defendant's position that the testimony of the accomplices shows that defendant was a member of a conspiracy to commit the burglaries, was liable as a burglar, and therefore could not commit the crime of receiving stolen property from himself. The jury's verdict on its face sufficiently resolves this argument against defendant. Defendant was found not guilty of conspiracy to commit burglary and to receive stolen goods. This interpretation of the evidence was permissible. Defendant could be found guilty as a receiver not pursuant to a prearranged plan but as a transaction independent of the burglary. ■ And on the other hand, if we assume that defendant and the accomplices agreed in advance that the accomplices should steal the property and defendant would receive it, the legal effect of such conspiracy would not be to exonerate any of its participants from any crime committed pursuant to the agreement but, rather, would support a holding that all "are accomplices in the offense or offenses resulting from execution of such plan." (*People* v. *Lima* (1944), 25 Cal.2d 573, 577 [2], 578 [3] [154 P.2d 698].)

Defendant urges that the trial court erred in failing to grant him a new trial on the ground of newly discovered evidence contained in the affidavit of one Robert Erwin Morgan. Morgan, an inmate of Folsom, made the following averments: Officer Hooper approached him while he was in the county jail. Morgan had left a fur coat with defendant as a part payment of a retainer for legal services and was "hot" at defendant because defendant refused to return the coat. Hooper said, "we are led to believe that if any man could sack him [defendant] up you could do it. . . . Would you be willing to say that you had given a stolen mink coat to Lyons?" Morgan answered, "I couldn't do that because the coat was not stolen." When Morgan insisted that "I could

never lie to put another man in jail,'' Officer Armstrong, who was also present, said, ''Wise guys like you belong in Folsom and by God I'll see that you end up there and for your information I'll have Lyons in jail with you within twenty-four hours and then you can both go to Folsom together.''

Affidavits of defendant and his counsel to the effect that the foregoing evidence was newly discovered and could not have been obtained by reasonable diligence at the time of trial were presented.

An affidavit of Officer Hooper contradicting Morgan's affidavit was filed.

It has been held that ''On a motion for a new trial, where conflicting affidavits are filed, the question of fact is one for the determination of the trial judge and his determination will not be disturbed upon appeal if there is substantial evidence, as there was in the instant case, to sustain his finding.'' (*People* v. *Young* (1938), 26 Cal.App.2d 700, 703 [4] [80 P.2d 138]; see also *People* v. *Kawasaki* (1913), 23 Cal.App. 92, 99 [137 P. 287].) Furthermore, it does not appear reasonably probable that this evidence, cumulative and impeaching, would have caused the jury to reach a different conclusion regarding the guilt of defendant. (*People* v. *Peyton* (1941), 47 Cal.App.2d 214, 224 [8] [117 P.2d 683].)

Defendant meritoriously contends that the receipt by him of the two items of property which are, respectively, the subjects of counts 5 and 6, constituted only one criminal transaction and that therefore he should not have been sentenced on two counts. The evidence of the accomplices shows that defendant originally received the watch and the fur coat on a single occasion. Therefore, but one offense of receiving stolen property is shown, although the goods were stolen from different sources, and the duality of the sentences, even though they are ordered to run concurrently, cannot be permitted to stand. (*People* v. *Smith* (1945), 26 Cal.2d 854, 858-859 [4-7] [161 P.2d 941]; *People* v. *Roberts* (1953), 40 Cal.2d 483, 491 [15-16] [254 P.2d 501].)

In a situation such as this, if any substantial objective of justice would be served thereby, this court could reverse the judgments as to both counts 5 and 6, order such counts consolidated, and remand the cause for rearraignment of the defendant for sentence and for sentence on the consolidated count. Inasmuch, however, as it does not appear that here either the state or the defendant will be prejudiced

by a simple reversal as to one count and affirmance as to the other, and as finality of adjudication will thereby be expedited, we conclude that the latter procedure is the more desirable.

For the reasons above stated the judgment based on count 6 is reversed and the judgment based on count 5 and the order denying a new trial are affirmed.

Gibson, C. J., Shenk, J., Traynor, J., Spence, J., and McComb, J., concurred.

CARTER, J.—I dissent. I cannot agree that there was sufficient corroboration of the accomplice testimony as required by section 1111 of the Penal Code. Insofar as the watch (count 5) is concerned, we see that there was only defendant's reply that he had had the watch for some time whereas, in reality, he had received it the night before from Dann Rio as, according to defendant, partial payment for attorney fees. There is no evidence in the record to show that defendant knew of the stolen character of the watch as required by section 496, subdivision 1 of the Penal Code. *People* v. *Lopez,* 126 Cal.App.2d 274 [271 P.2d 874], relied upon by the majority, was a case with an entirely different factual situation. In the Lopez case, the defendant made *several different answers* concerning his possession of stolen property. In the case at bar we have only defendant's statement that he had had the watch for some time. There is nothing to contradict his statement that it was given to him by Rio in part payment of attorney fees, and absolutely nothing to show that he knew of the stolen character of the watch.

With respect to the fur coat (count 6), the record shows that two of defendant's soiled shirts were in the PAA bag with the fur coat; that the bag was in the same room where defendant was found with the accomplices. The testimony concerning defendant's possession of the bag containing the fur coat is extremely dubious. The first witness testified that the accomplice had been carrying the blue bag marked with the letters PAA; thereafter the witness was contacted by Officer Hooper, although there had been an order sequestering witnesses, and changed his testimony so that it then showed that defendant had been carrying the PAA bag which contained the fur coat. The only testimony in the record showing defendant *might* have had knowledge of the stolen character of the coat was that of accomplices.

It should be noted that practically all of the lengthy summations of the evidence in the majority opinion consist of various transactions between the accomplices concerning fur coats and jewelry with the theft or receipt of which defendant was not charged. All of the alleged conversations which would tend to show defendant's knowledge that the fur and watch were stolen were testified to by accomplices and such testimony was not corroborated. The fact that defendant was present in the room where the fur coat was found is surely not such corroboration as that called for by section 1111 of the Penal Code where it is declared "and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. . . ." It appears to me that the so-called corroborating evidence requires "interpretation and direction from the testimony of the accomplice" in order to connect the defendant with the commission of the crime charged.

I find no substantiation in the record for the conclusion reached by the majority that the defendant "received the watch and fur coat on a single occasion," and that there was but one offense involved. Defendant received the watch on the night of April 7th. The only testimony linking him, even in the slightest degree, to the fur coat was concerning events on the 8th of April. There is nothing whatsoever to show that the watch and fur coat constituted a single occasion or part of a single offense. The majority opinion in its endeavor to show that there was corroboration of the accomplice testimony has this to say: "To show that there is inculpatory evidence apart from the testimony of the accomplices we first set forth a summary of such inculpatory evidence. *Defendant* himself testified as follows: He was a lawyer with practice largely in the field of criminal law. He represented Ferguson [an accomplice], who was charged in a federal case with conspiracy [etc.] . . ." It is apparent that the majority consider the fact that defendant represented criminals as corroborating evidence of the accomplice testimony. This is, of course, another instance where guilt by association is used to establish the *fact* of the crime charged. It is also the first case where, to my knowledge, an attorney who represents a person accused of crime has been considered as either an accomplice or as a principal to the crime charged. But here we have defendant's representation of the accomplices considered as "inculpatory evidence."

As the court held in *People* v. *Reingold,* 87 Cal.App.2d 382,

393 [197 P.2d 175], ''While it is true that the corroborative evidence is sufficient if it, of itself, tends to connect the defendant with the commission of the offense, although it is slight, and entitled, when standing by itself, to but little consideration, nevertheless, the rule is firmly established in our law that more is required by way of corroboration than mere suspicion or even grave suspicion. . . .'' In the case at bar, all the record shows is ''suspicion''—nothing more. Proof of a mere opportunity to participate in the crime raises no more than a suspicion of guilt and is insufficient corroboration (*People* v. *Braun,* 31 Cal.App.2d 593, 601 [88 P.2d 728]) ; association with the actual perpetrators of the crime also gives rise only to a suspicion of guilt that he advised, encouraged and participated in the crime and is insufficient corroboration (*People* v. *Braun,* 31 Cal.App.2d 593, 601 [88 P.2d 728] ; *People* v. *Long,* 7 Cal.App. 27 [93 P. 387] ; *People* v. *Koening,* 99 Cal. 574 [34 P. 238] ; *People* v. *Fagan,* 98 Cal. 230 [33 P. 60] ). In *People* v. *Petree,* 109 Cal.App.2d 184, 188 [240 P.2d 327], the court said : That while conflicting statements may tend to discredit the witness ''they are not evidence of the fact'' in issue.

When defendant sought to show Officer Hooper's bias and prejudice by cross-examining him as to the number of times he had contacted Pope, an original codefendant, conspirator, and witness for the prosecution, the proposed line of questioning was prohibited by the trial court. Although the scope of cross-examination is largely within the discretion of the trial court, a considerable latitude should be allowed to show the witness' state of mind and possible bias. (*People* v. *Winston,* 46 Cal.2d 151, 157 [293 P.2d 40] ; *People* v. *Pantages,* 212 Cal. 237, 255 [297 P. 890] ; *People* v. *Evans,* 113 Cal.App.2d 124, 127 [247 P.2d 915].) Under the peculiar facts of this case it appears to me that defendant should have been permitted to question Hooper as to the number of times he had been with Pope. It will be recalled that the People dismissed the charges against Pope (after the commencement of the trial) who then became a witness for the People. Inasmuch as there is only Officer Hooper's statement concerning defendant's reply when asked about the watch, his statement to defendant about an ''anti-police'' feeling, and the fact that he contacted Officer Roberts about the ''mistake'' in his testimony concerning defendant's possession of the blue bag, marked PAA, it appears to me that the defendant should have been permitted wide latitude in

cross-examining Officer Hooper to show bias and prejudice against the defendant. When it is considered that the corroborative evidence as to the watch consisted entirely of Officer Hooper's statement, it becomes immediately apparent that the jury was entitled to have before it any available evidence on the matter of bias and prejudice.

It is argued that it was prejudicial error for the People to make the following statement in that it left the inference with the jury that the prosecution had personal knowledge of the guilt of the defendant: "Maybe this is a good point to bring up right now, but it is not the function of the District Attorney's office to go around recklessly indicting people and bringing charges against them. Our duties are not to prosecute people just for the sake of making prosecutions. It is our duty to protect the citizens of this County against crimes." There was no objection by defense counsel and no request at the time for an instruction admonishing the jury, although an instruction was given to the effect that statements of counsel did not constitute evidence in the case. A case somewhat similar is *People* v. *Hale,* 82 Cal.App.2d 827 [187 P.2d 121], where the district attorney in his argument to the jury referred to the fact that the grand jury had indicted the defendants "on the theory that both defendants were guilty . . ." and after objection by defense counsel which was overruled by the court, the district attorney concluded with this statement: "That is why I say the grand jury was right when they indicted both of them." The court in the Hale case held that as to one defendant where the evidence of guilt was "much weaker" the remarks of the district attorney constituted prejudicial and reversible error. It appears that even had there been a request for an admonition at this time the error would not have been cured. The quoted remark assumes the guilt of the defendant and was highly prejudicial under the facts of the case. (*People* v. *Hale,* 82 Cal.App.2d 827 [187 P.2d 121] ; *People* v. *Berryman,* 6 Cal.2d 331 [57 P.2d 136] ; *People* v. *Vienne,* 142 Cal.App.2d 172 [297 P.2d 1027] ; *People* v. *Talle,* 111 Cal.App.2d 650, 676 [245 P.2d 633].)

Another instance of misconduct on the part of the district attorney which appears to have been highly inflammatory and prejudicial is the following statement made during closing argument: "And there has been only the insinuation, the insinuation that all of the People's witnesses who were accomplices or in any way connected with defendant, were allowed to plead guilty to only one or two Counts. Ladies and gentle-

men of the jury, that is a matter, I believe, of common knowledge, that if there are three or four Counts against some defendant, that defendant is permitted to take a plea to one or more of the Counts. And even after three days of trial they allowed Mr. Moeckel to plead guilty to two Counts of Robbery. Why? It is obvious. In his sentence the Judge made the sentences run concurrently. Why try him on two or three of four Counts when he can be found guilty on one Count or when he pleads guilty to one or two Counts? The Judge made the sentences run concurrently. *If we took a plea of two Counts against Pope and one Count against Mr. Ferguson, the big receiver, we will offer Mr. Lyons the same consideration. If at any time during this trial he wanted to plead guilty to one Count, or if he would like to do so even now, we will give him the same consideration.*" An objection by defense counsel was sustained and the jury was admonished to disregard the remark. Defendant argues that no admonition could have cured the error inasmuch as it stressed his association with others who had pleaded guilty to the very charges for which he was on trial. In my opinion, defendant's argument is well taken and the remark constituted prejudicial misconduct on the part of the district attorney. (*People* v. *Kirkes,* 39 Cal.2d 719 [249 P.2d 1]; *People* v. *Teixeira,* 136 Cal.App.2d 136 [288 P.2d 535]; *People* v. *Bell,* 138 Cal.App. 2d 7 [291 P.2d 150].)

In another instance it appears that the district attorney, in his argument to the jury, committed misconduct: "And some of the jewelry is not in evidence. And the reason for that is because we could not show Mr. Lyons' connection with the other fur coats or with the other jewelry. The fur coat carried in this bag, Exhibit 18 [the bag], was the ermine coat, and that is here, but the fur coat carried by Mr. Ferguson in that cardboard box is not here because we can not show Mr. Lyons' connection with that fur coat." It will be recalled that whether defendant carried the blue bag containing the fur coat was a very close issue of fact in the case. This statement assumes that the defendant was carrying the bag and that his guilt had been established. While there was no request for an admonition, it appears that in this instance, as in the preceding ones, an admonition would not have cured the highly prejudicial effect created by the district attorney in assuming personal knowledge of defendant's guilt.

Another instance of claimed prejudicial misconduct is the district attorney's reference to the defendant as the "mouth-

piece'' for the defendants who had pleaded guilty and whom he had represented and was to represent in other criminal matters. Defendant argues that this was an unwarranted attack upon his character since the term carries with it an unsavory connotation. It is my opinion that defendant's claim that the term carries an unsavory connotation is well taken. It also appears that the use of the term was unnecessary and that the prosecution should not indulge in defamatory remarks concerning the defendant in any criminal case and that the practice should not be condoned by this court. Standing alone it may not have prejudiced the jury unduly but taken together with the other errors in the case it is difficult to determine just what effect the use of the term may have had.

Defendant argues that he was denied due process of law in that the sentencing of Pope, Ferguson, and Rio was continued from time to time due to continuances in his case; that such postponement of imposing sentences on these accomplices until after the time defendant had been sentenced constituted intimidation and coercion of these witnesses against him. The district attorney admitted that ''inducements'' had been extended: ''Counsel said there were inducements for Pope, Ferguson and Rio to testify, and I would be trying to fool you if I said there was not, ladies and gentlemen. The plain, ordinary, hard facts in this case are that we had to offer some inducements to Pope, Rio and Ferguson to testify. But were they given complete immunity? No. Have they been given lesser sentences? No. They were treated like every other criminal or any other person charged with a crime. Rio was given a year in the county jail as a condition of probation. That was apparently his first offense. He was sentenced before he testified here, ladies and gentlemen. He had nothing to gain and nothing to lose when he testified here.

''MR. JAMES CANTILLON [attorney for defendant] : I object to that your Honor. There was testimony that the sentence to the burglary charge is still hanging over his head.

''THE COURT: That has been argued pro and con, of course. You may continue.

''MR. STOVITZ: How else would we get any testimony here, ladies and gentlemen, other than by the testimony of the accomplices? These men who will have to live in confinement, who will have to fear the ostracism that comes with being a stool pigeon, how can you get these men to testify? We have

to say to them, 'Look, we will tell the Judge you cooperated in this case.' But are you going to say that the Judge is corrupt when he takes a defendant's cooperation into consideration? I don't think you can say that. I think the District Attorney's office has done its job here, and I think the Police Department has done its job, and I think the judges have done their job, and that is to protect you, ladies and gentlemen.''

Pope, admittedly guilty of burglary, was sentenced to one year in the county jail and the remaining counts against him were dismissed; Rio, also admittedly guilty of burglary, was sentenced to a year in the county jail. What sentence was imposed on Ferguson does not appear, although the district attorney stipulated as follows with defense counsel: ''His [Ferguson's] plea of guilty was entered on May 10, 1955, *and the time for the sentence has been continued from time to time due to continuances granted in the Lyons case.''* (Emphasis added.)

In *People* v. *Walther,* 27 Cal.App.2d 583, 591 [81 P.2d 452], the court said: ''When a codefendant who is a coconspirator has been offered immunity from prosecution in reward for his testimony, the cause should be promptly dismissed against him. Otherwise, the maintenance of the action against him throughout the trial may serve to intimidate the witness and furnish an inducement for him to color his testimony. Moreover, retaining a person as a party defendant throughout the trial, who has been promised immunity from prosecution in reward for his evidence may become a mere subterfuge to avoid the necessity of adhering to the established rule that the fact of the existence of a conspiracy may not be proved by the admissions of a coconspirator.'' It appears to me that the same rule should apply to sentencing accomplices who have pleaded guilty, in that refraining to do so until they have testified against one accused with them of conspiring, may very well color their testimony in the hope that the sentence imposed on them will be commensurate with the cooperation given by them to the prosecution. The People argue that there was not the slightest evidence that any leniency would be extended to these witnesses ''only if their testimony resulted in the conviction of the appellant. . . .'' It would appear from the district attorney's statement to the jury (heretofore quoted) that these witnesses had been promised ''inducements'' is sufficient to show that lenience had been promised them for their testimony against defendant. In *People* v. *Green,* 102 Cal.App.2d 831, 839 [228 P.2d 867], a witness had

been promised immunity if he would give testimony which would result in another being bound over for trial. The court held that "A miscarriage of justice was occasioned through the use by the State of testimony which, because of the condition upon which immunity depended, was impure, dubious and 'tainted beyond redemption.'" The majority holds here that no such condition existed in the case at bar and that no reversible error is shown. While the admitted "inducements" undoubtedly consisted of leniency in sentencing the accomplices, it appears that the delay in sentencing the accomplices until defendant's trial was concluded was "in its practical and legal effect, indistinguishable from a threat." (*People* v. *Green, supra,* at p. 838.)

For the foregoing reasons, I would reverse the judgment and order denying a new trial.

Appellant's petition for a rehearing was denied May 27, 1958. Carter, J., was of the opinion that the petition should be granted.